## DAVIS & GOGGIN v. STATE NAT. BANK OF EL PASO et al.

(Court of Civil Appeals of Texas. El Paso. March 20, 1913. Rehearing Denied April 25, 1913.)

1. ASSIGNMENTS (§ 52*)—EQUITABLE ASSIGNMENTS—ORDER ON PARTICULAR FUND.

A mere agreement, whether by parol or in writing, to pay a debt out of a designated fund, is not in itself sufficient to constitute an equitable assignment; but there must be an appropriation pro tanto either by an order on the specific fund or by transferring the amount otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 107–111; Dec. Dig. § 52.*]

2. ASSIGNMENTS (§ 137*) — ACTIONS — EVIDENCE—SUFFICIENCY.

In an action involving the validity of an equitable assignment, evidence *held* sufficient to establish that an oral agreement, whereby the assignor agreed to pay his attorneys, the assignees, out of the fund in litigation, amounted to an appropriation pro tanto of the fund which gave the attorneys priority over a subsequent assignee.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 234; Dec. Dig. § 137.*]

3. ASSIGNMENTS (§ 52*)—MAXIMS.

The particular form of an agreement, whereby defendant was to pay interveners out of a fund in litigation, is not material as to the validity of the equitable assignments, for equity looks rather at the intent and purpose than the form.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 107–111; Dec. Dig. § 52.*]

4. ASSIGNMENTS (§ 52*)—EQUITABLE ASSIGNMENTS—VALIDITY.

An agreement to pay the assignee out of a particular fund is sufficient as an equitable assignment, though verbal.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 107–111; Dec. Dig. § 52.*]

5. ASSIGNMENTS (§ 85*)—EQUITABLE ASSIGNMENTS—PRIORITY.

In case of successive equitable assignments, the priority of the parties depends upon their priority in time.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 149–151; Dec. Dig. § 85.*]

6. ASSIGNMENTS (§ 85*)—EQUITABLE ASSIGNMENTS—PRIORITY—CONSIDERATION.

Where a debtor made several assignments of one fund, the second assignment being given merely to secure loans already made, and no further loans being made in reliance thereon, the second assignment is not one for a valuable consideration, and the second assignee cannot claim priority though taking without notice of the first assignment.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 149–151; Dec. Dig. § 85.*]

Error to District Court, El Paso County; James R. Harper, Judge.

Action by C. B. Bell against J. P. Casey and the State National Bank of El Paso, in which Davis & Goggin intervened. There was a judgment for the bank against the interveners, and they bring error. Reformed and affirmed.

Davis & Goggin, of El Paso, for plaintiffs in error. Beall & Kemp, of El Paso, for defendants in error.

HIGGINS, J. On February 17, 1909, C. B. Bell filed suit against J. P. Casey for the recovery of one-half of the proceeds of the sale of certain mining properties, the total proceeds of which sale amounted to $38,500, of which amount $2,500 had been previously paid to Casey, $15,500 thereof had been deposited to his account in the State National Bank, and $20,500 was to be placed to his account in said bank on or before April 25, 1909. The appointment of a receiver was asked, and an injunction was issued restraining the bank from paying to Casey any part of said $15,500, and on February 25, 1909, in accordance with the prayer of the petition, George D. Flory, who was likewise cashier of said bank, was appointed receiver of the funds in controversy, and the bank was directed to deliver, and did deliver, to the receiver all of said moneys then on hand belonging to Casey, or which afterwards came into its possession. On December 7, 1909, Bell amended his petition and sought to recover the entire proceeds of such sale. On May 23, 1910, Bell recovered judgment against Casey for the sum of $23,250, and the same was decreed to be a charge against the funds in the receiver's hands. The judgment ordered the money in the hands of the receiver to be paid to Casey after the judgment in favor of Bell and court costs had been first satisfied. On June 3, 1909, Casey executed an instrument in writing, reciting that he desired to assign the said funds in the receiver's hands for the purpose of raising money thereon, wherefore he assigned to L. J. Gilchrist the said sum of $38,200.00, and guaranteed the payment of one-half of said sum to the said Gilchrist, and he covenanted that he was in fact the owner of the entire fund and entitled to assign and transfer the same, and authorized Gilchrist for his own use and benefit to collect and receive from the said

receiver, Flory, the above-mentioned sum and funds and every part thereof. This assignment was filed in the cause on June 3, 1909, and it would seem the State National Bank is claiming some rights thereunder; but there is nothing whatever in this record to indicate that the bank in any manner acquired any rights under this assignment, and the same is entirely irrelevant to this proceeding, as none of the parties in any wise connected themselves with this transfer. On May 24, 1910, Casey, in writing, transferred and assigned to the State National Bank all of his right and interest of every nature under the judgment, and the same was filed among the papers of the cause on that date. Bell's rights under the judgment by assignments passed to C. O. Ellis and W. M. Peticolas. On December 18, 1911, plaintiff filed a motion alleging the execution of the assignments to Ellis, Peticolas, and the bank, and prayed distribution of the funds in the receiver's hands and payment thereof to said assignees. The State National Bank and the receiver on the same date joined in said motion and asked for distribution of said funds to such assignees.

On December 30, 1911, Waters Davis and J. M. Goggin, composing the law firm of Davis & Goggin, filed their plea in intervention in the cause, alleging that by virtue of an assignment made to them by Casey on or about February 20, 1909, they had an interest in the funds in the hands of the receiver or a lien upon the same to secure an attorney's fee for services rendered in the cause; that on the date last mentioned Casey promised and agreed to pay them the sum of $1,500 for legal services rendered and to be rendered in the cause, and he then and there verbally assigned to interveners so much of the funds mentioned in the receiver's hands as would be necessary to satisfy said fee; that on March 18, 1909, he paid interveners the sum of $250, leaving a balance of $1,250 due and unpaid; that on the ——— day of ———, 19——, they notified the State National Bank of their assignment in part, and thereafter, on May 27, 1909, again notified the bank and the receiver fully as to the facts concerning said assignment, and the receiver and the attorney for the bank promised and agreed that there was no purpose on the part of the bank to disregard interveners' rights, and that interveners' rights to an attorney's fee out of the funds would be protected; that the assignment in favor of interveners was prior to and had precedence over the assignment to the bank above referred to.

Upon hearing of the motion for distribution of the funds in the receiver's hands, an order was entered directing payment of court costs to be first made, that the assignees Peticolas and Ellis be paid the amount awarded Bell in the cause, and that the remaining moneys and property in the receiver's hands awarded to Casey be paid and delivered to the State National Bank by virtue of their rights under aforesaid assignment.

From the order of the court disallowing their claim and ordering distribution of the funds as above stated, the interveners, Davis & Goggin, prosecute this writ of error, and it is here contended in effect that the agreement between Davis & Goggin and Casey constituted an equitable assignment pro tanto of the funds in controversy, and that by virtue thereof they had an equitable interest in or lien upon the funds in the hands of the receiver superior to the rights of the bank under its subsequent assignment.

The trial court filed no findings of fact or conclusions of law, and the question presents itself for review upon the record made upon the hearing.

The intervener Waters Davis conducted the negotiations with Casey, and testified: "I would state that, when this suit was filed, Mr. Casey employed us to defend the suit, and the conversation was with me. I had the transactions with Mr. Casey as to attorney's fees, etc. It was agreed at that time that the attorney's fee should be $1,500, payable then; but afterwards Mr. Casey thought that the plaintiff was not going to claim but half the funds in the hands of the bank, so I told him that, if the plaintiff didn't claim but half of what we thought he was going to claim, we would just make the fee half, $750.00. But as a matter of fact, I think by first amended original petition, the plaintiff claimed all the funds, so that the $1,500 fee that we originally agreed upon was in effect. At the time we agreed upon the fee of $1,500, Mr. Casey said that he had no money, no ready money available, and gave us an interest in the fund, that we might take our fee out of the fund that was in the hands of the bank, or the receiver at the time. I am not positive that the receiver had been appointed then. I may be mistaken as to that, but it was just after the suit was filed, and I notified the bank; I think that when I notified them I first notified them before there had been any assignment to them at all. That is my recollection of it. At that time it was before the amended petition had been filed, claiming the whole fund, and I think I notified them that our fee would be $750.00, and that a portion of the fund had been assigned to us, but afterwards there was an assignment made to them, and I sent them another notice. I have given them notice to produce that letter. This is a letter that I sent the bank and also Mr. Flory, on May 27, 1910, which says: 'State National Bank, City—Gentlemen: Upon learning of the fact that Mr. Jno. P. Casey, Jr., has assigned to you his interest in judgment in the case of Bell v. Casey, recently tried in our district court, we took up with Mr. George Flory, your cashier, and Mr. Maury Kemp, your attorney, the matter of assignment to

us of so much of the fund as is necessary to pay our attorney's fees, and have been advised by them that there was no purpose on the part of the bank to disregard our rights and that our right to attorney's fee out of the fund would be protected. We think, however, that a formal notice would be well so that you might keep the matter in mind and have our notice on record. Would say that the attorney's fee in this case at the time the suit was instituted was fixed at the sum of $1,500, but it was afterwards thought by Mr. Casey that plaintiff would claim only half of the money on deposit with you instead of all of it, in which event we agreed that the attorney's fee would be reduced to $750. Plaintiff, however, has continued to claim the whole amount so that the sum of $1,500.00 is applicable as attorney's fee instead of $750.00 as was contemplated might be the case. Mr. Casey, in order to secure our fee at the time it was agreed to, verbally assigned to us so much of the amount recovered in the judgment as would be sufficient to satisfy the same. Notice of the assignment, when it was thought the claim might be reduced by plaintiff to recovery of half the proceeds of the amount on deposit, we think was given to you in writing, but we do not know that we mentioned the fact that the agreed fee was $1,500.00 in the absence of plaintiff's modified claim. You may refer to Mr. Casey as to the correct statement of the facts herein and in view of which we wish that you would kindly protect our fee in the fund as was agreed upon by Mr. Casey before your assignments were made. Yours respectfully, [Signed] Davis & Goggin.' I will state that I saw Mr. Flory at the bank, and Mr. Flory told me there was no purpose on the part of the bank to affect our attorney's fees by their assignment, and that they would protect us in the fund. I also saw Mr. Kemp—I think Mr. Flory referred me to Mr. Kemp, I am not sure—but I saw Mr. Kemp right down here in the courthouse yard, and I spoke to him about it, and he told me about the same thing in substance that Mr. Flory had. After the fee was agreed upon, the assignment of the fee was verbal; there was no written assignment to me by Mr. Casey. He paid us $250.00, so there would be only $1,250.00 due on the attorney's fee. We have charged nothing for outside work that has been done."

On cross-examination the witness said: "The date of that letter is May 27, 1910. Yes, that letter was written after the assignment by Mr. Casey to the bank, but I had written to them before as I recollect, as I mentioned in that letter. I, of course, can't remember exactly the words that passed between Mr. Casey and me. We talked about it a number of times. The agreement was an agreement that our attorney's fees should be paid out of this fund in the hands of the bank. I think it was in the hands of the bank at the time the agreement was made, but I don't think the receiver had been appointed. I don't think that either Mr. Kemp or Mr. Flory put the matter in a way as if our rights were not effective, or if our rights were not existent, that they put that in, but they put it in a way as that our fee would be protected—not whatever rights we had, but admitting or in the nature of an admission that we did have rights. It wasn't the question of whether we had the right or not. I don't think my impression from the statement made by Mr. Kemp and Mr. Flory was that our claim would be protected in advance of theirs, or that their claim would not prevent the collection of ours, but that they would protect our attorney's fee in the matter. I understood that the promises made to me by Mr. Kemp and Mr. Flory were that the attorney's fee would take precedence over the bank's claims. If I hadn't understood it, I would have taken some steps in the matter, because we have done a great deal of work in the case, and the fee has been due ever since that time, and I would have taken steps to protect ourselves further, but I was satisfied by what Mr. Kemp and Mr. Flory said, and that it was understood that the bank would protect us in the payment of our fees, or otherwise I would have taken action before this. I had just dismissed it from my mind."

Casey testified: "As I recollect it, it was in February when this suit was begun, and that is when I employed Davis & Goggin. In fact, I had spoken to Mr. Davis before that, some time, when I heard of its coming up. Mr. Davis attended to it before it actually came up and helped in getting up the record, and when the suit was brought he asked me, if I remember, $2,500, and we finally agreed on $1,500, and afterwards that he would get half of that, and then the amended petition was filed, and the fee of $1,500 was to be the fee. It is my recollection that, if the case went to the jury and the plaintiff was claiming the entire fund, the fee was to be $1,500. It was to be paid out of the funds in the bank. I paid Mr. Davis $250, and I think I paid Mr. Stanton something too. I consulted with Col. Morehead, and I employed Mr. Stanton. I paid the $250, I think, right about the time we agreed on the fee. I don't know and I can't tell exactly. I know I paid $250, leaving a balance of $1,250. That was before Mr. Flory was appointed receiver. I know the receivership hearing was held in April, and we had gone into the matter before that time. I can't say whether or not I paid the $250 when the fee was first agreed upon and the fund assigned; my check will show that. The money was in the State National Bank at that time. There was part of it put in my account at first. I think some of it was put in on the 20th of January, 1909, and then I think on February 15th, just before the suit was brought, or the very day it was

filed, there was $5,500 put in, and on April 25th, they deposited the balance of the money, in 1909."

Cross-examination: "From my standpoint I can't say that my understanding with reference to the payment of the money to Davis & Goggin for their services was anything more than an agreement to pay them out of this fund. I agreed to pay them out of the fund. I know I told them—they asked me about my other property and how I was fixed. Yes, they were determining my ability to pay the fee; they asked me all about it. I agreed to pay them out of the fund. I had not assigned the fund to the State National Bank at that time, but afterwards. It was the fund that I afterwards assigned. I agreed to pay them out of the fund. I believe Judge Davis spoke about a written assignment. I was to have executed a written assignment, and I might have done it, I signed so many things that I don't exactly remember. I made the assignment to the bank. I didn't execute any assignment to Mr. Davis that I recollect. I am telling you just what occurred, telling you what I did. I don't know what you would call an agreement to pay him out of the fund—I agreed to pay him out of the fund, and that it was to go as security for his part of his fee. That was before the case ever went into court. That was before the receivership, and we talked about it afterwards, and I agreed the same way afterwards."

Redirect examination: "I didn't have charge of the money, and I couldn't have paid it, because I couldn't get at it. It never came to me. I understood the agreement to be that Davis & Goggin's attorney's fee was to come out of that fund. At that time I had made no assignment to anybody else. I don't remember whether or not I saw any letter in which Mr. Davis told the bank that they could refer to me as to the assignment, and whether they ever asked me if I had assigned the interest in that fund to Davis & Goggin, Mr. Morehead, or Mr. Flory. I don't remember; I know it was talked over, but I can't remember what was said. I fixed Stanton up and his contract when I hired Stanton, and we agreed—"

Recross-examination: "I stated a few days ago to Mr. Morehead and Mr. Flory that I had no written assignment. I told them that I made no assignment since the receivership. I agreed that Davis & Goggin should get their fee out of the fund. That is what I stated to them, exactly as I am stating it now."

Redirect examination: "How could I agree to go any pay it out of the fund? The fee was to come out of the fund, be paid by the bank. I couldn't pay it out of the fund at all. * * * I agreed with Davis & Goggin that their attorney's fees should be paid out of the fund; that is what I understood it. As I said before, I couldn't pay it, even if I wanted to. The bank had the money. I understood it would be paid out of the fund by the bank, or their successors in trust, in charge of the fund."

Cross-examination: "It is a fact that my agreement was simply that Davis & Goggin were to be paid out of that fund in the bank. We didn't know what was going to be done with it, at the time, or whether the bank would retain it. I understood it was in the hands of the bank. I don't understand what you are getting at. I will tell you again what we agreed. As I understood it—I can't call the language now—I know that they were to be paid out of the fund in the bank. At that time the funds were under the order of the court, and they had been attached by the garnishment. I couldn't get at the money, but I supposed the funds in the bank were good for that amount, and that was my understanding. I understood that the fee went against the funds. I couldn't go and pay the money myself. I understood that they were to be paid out of the fund by the bank. The agreement was that Davis & Goggin's fee was to be paid out of that fund. It was to be paid by the bank. I couldn't give it; I couldn't get at it. The agreement was that they were to have the fee paid out of it. I understand that their fee was a lien against the fund in the bank, and that the bank had to pay it; in other words, that they were to get it out of that fund. I can't call the exact language that I used to Mr. Davis, but I am telling you the substance of it. I don't remember the exact words, but I know what the contract was."

Redirect examination: "That is what I understood about it, because before I made the Gilchrist assignment, I came up and talked to Mr. Davis about the matter, and if I remember, he was drawing up some assignment or other. I first assigned to Gilchrist, and then is when we talked about it, or rather had some conversation in regard to it. I didn't expect to get hold of this money before Davis & Goggin got their money from the receiver or from the bank, or whoever had the funds under control. My understanding was that that attorney's fee was to come out of that fund, whoever had the fund. I couldn't have paid it myself out of the fund, because I didn't have the funds and couldn't get at them. Certainly I would have paid it. I agreed that it would be paid out of the fund. The fund had to pay it. I understood that the fund was then in the bank. The fund was held there as security. I can't remember whether there was any agreement as to who should pay it. I don't remember now that anybody was named, except that the fund was in the bank, and that was all. The bank was to pay it. That was the way I understood it all the time; it was to come out of the fund. * * * At the time I executed the assignment to the bank, I don't recollect whether I said anything to the

bank with reference to any assignment to Messrs. Davis & Goggin. Stanton drew the last assignment. At the time of this assignment I think I came up and talked with Mr. Davis before I made that assignment. I talked it over with Stanton. I don't think I said anything to the bank about any assignment to Messrs. Davis & Goggin; I might have and might not. That assignment was drawn up and I signed it. It assigns everything over and above the judgment. It was drawn up in that manner and I signed it. Certainly, that was what I intended to do. The funds were in the bank, but at the same time I had made the agreement that Davis & Goggin's fee be paid out of that fund. I don't know if you call that an assignment or not. I can't see where you get the difference between an assignment and an agreement. The bank was to get the money by that assignment. Yes, I knew the bank was expecting to get back all the money it loaned me, and I will see that they do get it. I didn't know that if the plaintiff prevailed in the suit of Bell against Casey that there would not be enough money over and above that to pay the bank's entire indebtedness. I never conceded it, and don't concede it now. Yes, it is a fact. At the time of that assignment, there was enough money in there to pay the bank, just about enough. We figured that out. The plaintiff sued for the whole thing. I didn't know the bank couldn't be made whole, but I never had any idea that he would get it all. When I executed this assignment to the bank, it was my intention that the bank would have all over and above the amount of the judgment that was recovered in the litigation. They asked me for the assignment and I gave it to them. I talked it over with George Flory and Mr. Morehead. I wanted the bank to be made whole, as near whole as they could, out of this money. I think that was my purpose when I executed that assignment, but subject to the other things, the fee of Judge Davis; subject to the contract or whatever you call it, or assignment to Mr. Davis. If the attorneys didn't know what to do, how would I know what to do? I didn't know, when I talked with Mr. Davis about the matter, that I had already made the assignment to the bank. I had made no assignment then. I had talked to them about making the assignment to the bank; that is, I talked to Judge Davis, as to the assignment I was going to make, the first assignment, the Gilchrist assignment. We talked about the other assignment too. I talked with Mr. Davis about representing me in the case before the suit was brought, before the money was paid. I didn't give him a check for the money before the attachment suit or injunction was served because I didn't have it. I didn't have a bit of it. I first talked with Mr. Davis about the case about the first of December. I think he had to fix up the Mexican papers in December, 1908. He was president of the Mexican corporation then. That was not when the fee was fixed. We didn't contemplate any suit then. The fee was fixed just about the time of the filing of this suit, at the time of the injunction. Along about the first or second week of February, I think it was the 17th of February, or about a week before that. Then after that we talked about it, and as to the accounting, and we agreed as to the $1,500."

Redirect examination: "I was served right here at the bank. I went to Mr. Davis immediately. On the 17th of February, 1909, $1,500 was put in the bank, and then I was served with the injunction papers. The receiver was appointed in April. The fund was in the bank, and the injunction prohibited the paying over of any of the funds to me. The receiver was appointed in April, after the application. It was about the time of the filing of the suit that I had my first understanding with Mr. Davis. He was getting some papers up then, and the papers in this suit were filed. How could I make any agreement that I would pay the money myself out of that fund? I think the fee was agreed on at the same day the suit was filed, or the day after, right around that time. My statement to Mr. Morehead and Flory a few days ago in Mr. Morehead's office was simply to the effect that I had merely agreed to pay this money, exactly as I say now. I said that I had made no written assignment. I meant a written assignment. I said exactly what I am saying now. I never go around the corner. They were all discussing with me the question of this assignment. Yes, I told them that I didn't execute any assignment. We started to do it, but it was put off for some reason or other. It is a fact that it was after the money was paid into the bank, and after the injunction was issued, that I made the agreement with Judge Davis. It was just about that time. It was after the money was on deposit in the bank and after the injunction had been granted. I didn't make a written assignment. I agreed with Mr. Davis that I should have out of this fund a sum sufficient to pay his fee, and I paid him $250 of it. I agreed that this money should be paid out of the funds then in the bank. I understood that he could collect it or that Davis & Goggin could collect it from the bank. I don't remember about the wording of it. My understanding was that their fee was to be paid out of the fund in the bank. It was my understanding that that fund was security for his fee. I am telling you as near as I can what passed, and that he was to get his fee out of the fund in the bank. I couldn't check on it. The bank had the money, and my understanding was that he was to get it out of that fund. There was no question about that up until a few weeks ago."

Intervener Davis, recalled, testified further: "I will state under oath that I did not understand that Mr. Casey agreed that

he would pay this out of the fund. I did not understand he agreed to do that himself. I am satisfied he didn't, but that it should be paid out of the funds by-the bank, or whoever had it, and assign to us a part of the fund itself, sufficient to pay the fee. * * * It wasn't the agreement that Mr. Casey should pay the fee out of the fund, because at that time the fund had been put in the custody of the court. There had been a garnishment issued, and they were enjoined from paying that fund to Mr. Casey, as I recollect it, and the agreement was that the bank should pay the fee out of the fund. I will state further that after having the conversation with Mr. Kemp and Mr. Flory —I don't know what they understood—but I understood that our fee would be protected to the extent that it would be paid, and I think I so expressed it in this letter. I wrote the letter both to the bank and Mr. Flory and got no answer from them and had depended on that, and I relied that our fee would be paid before the others, and have relied on that ever since, until recently. Had I not relied on that, I would have insisted that Mr. Casey do something, or that somebody do something, for us to get our fee. I thought that we would get our fee ultimately and that the bank would pay it. If we hadn't relied on that, we probably would not have done a great deal more work that we have done for Mr. Casey since the judgment was entered and on appeal and after the appeal and judgment was affirmed. I depended upon the bank to protect our fee just as they said. At that time, I believed there was enough funds to pay both the bank and us, and probably that was the reason the bank was satisfied to let the matter go as I have stated. Since then the fund has been depleted, so that it can't pay both of us."

Discussing the doctrine of equitable assignments, in 3 Pomeroy's Equitable Jurisprudence, § 1280, it is said: "In order that the doctrine may apply, and that there may be an equitable assignment creating an equitable property, there must be a specific fund, sum of money, or debt, actually existing or to become so in future, upon which the assignment may operate, and the agreement, direction for payment, or order, must be in effect an assignment of that fund or of some definite portion of it. The sure criterion is whether the order or direction to the drawee, if assented to by him, would create an absolute personal indebtedness payable by him at all events, or whether it creates an obligation only to make payment out of the particular designated fund. The agreement, direction, or order being treated in equity as an assignment, it is not necessary that the entire fund or debt should be assigned; the same doctrine applies to an equitable assignment of any definite part of a particular fund."

And in discussing the subject of equitable liens, the same author says:

"It follows, therefore, that in a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, in additition to the personal obligation, a peculiar right over the thing concerning which the contract deals, which it calls a 'lien,' and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing. The theory of equitable liens has its ultimate foundation, therefore, in contracts, express or implied, which either deal with, or in some manner relate to, specific property, such as a tract of land, particular chattels, or securities, a certain fund, and the like. It is necessary to divest one's self of the purely legal notion concerning the effect of such contracts, and to recognize the fact that equity regards them as creating a charge upon or hypothecation of the specific thing, by means of which the personal obligation arising from the agreement may be more effectively enforced than by a mere pecuniary recovery at law.

"The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor but of his heirs, administrators, executors, voluntary assignees, and purchasers or incumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, 'Equity regards as done that which ought to be done.' In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or rendered capable of identification, is to be held, given, or transferred as security for the obligation. * * *

"The form or particular nature of the agreement which shall create a lien is not very material, for equity looks rather at the final intent and purpose rather than at the

form; and if the intent appear to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and the property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows. Among the kinds of agreement from which liens have been held to arise, the following are some important examples: Executory agreements which do not convey or transfer any legal estate in the property, but which stipulate that the property shall be security, or which pledge it, for the performance of an obligation. As an agreement to give a mortgage creats a lien, so a mortgage which, through some informality or defect in its terms or mode of execution, is not complete and valid as a true and proper mortgage, will nevertheless generally create an equitable lien upon the property described. The intent to give a security being clear, equity will treat the instrument as an executory agreement for such security. An assignment of the rents and profits of land as security for a debt is another mode of creating an equitable lien on the land in favor of the assignee, and the assignment of a lease by way of security produces the same effect. The assignment for a similar purpose of a contract for the purchase and sale of land may in like manner operate to create an equitable lien in favor of the assignee. The equitable liens which arise from such assignment must largely depend upon a performance of the conditions and stipulations contained in the original contracts, whatever be their form, which are assigned. An equitable lien may sometimes be created upon bills of exchange or upon a consignment upon which bills of exchange are drawn, by means of a specific appropriation, at all events where the drawers or acceptors have become insolvent. The foregoing instances are sufficient to illustrate the doctrine of equitable lien arising from express contract. They show that the form is immaterial, if the intent appears to make any identified property a security for the fulfillment of an obligation." See 3 Pomeroy's Equitable Jurisprudence, §§ 1234, 1235, 1237.

In discussing the subject of liens arising by equitable assignments in Jones on Liens, it is said: "An equitable lien arises from an order given by a debtor to his creditor, to receive payment out of a particular fund. * * * This rule applies to agreements made by attorneys with their clients, whereby they are to receive a share of the fund to be recovered as a contingent compensation for professional services, for such agreements, when made for the prosecution of certain classes of claims, of which may be instanced claims against a government, or in one of the executive departments of a government, are not in violation of public policy. Such agreements, if they virtually assign a part of the claim, or an interest in it,

create a lien upon the fund recovered. * * * To constitute an equitable lien on a fund there must be some distinct appropriation of the fund by the debtor, such as an assignment or order that the creditor should be paid out of it." See 1 Jones on Liens, §§ 43, 44, 50.

[1] On the other hand, a mere agreement, whether by parol or in writing, to pay a debt out of a designated fund of itself is not sufficient; there must be an appropriation of the fund pro tanto either by an order on the specific fund or by transferring the amount otherwise in such a manner that the holder of the fund is authorized to pay the amount directly to the creditor, without the further intervention of the debtor. In other words, an equitable assignment can be effected only by a surrender or control over the funds or property assigned. For instance, the mere promise of a debtor that *he* will pay a debt out of particular funds is not sufficient; there is lacking the specific appropriation of the fund pro tanto and surrender of control thereof. In like manner a bill of exchange does not of itself constitute an equitable assignment of the sum for which it is drawn, unless it specifies the particular fund upon which the order or bill is drawn, and the drawer has divested himself of all right to control the fund. The same rule applies to ordinary checks. 1 Jones on Liens, §§ 51, 52, 55, 57; House v. Kountze, 17 Tex. Civ. App. 402, 43 S. W. 561; McBride v. American, etc., 127 S. W. 229.

The Court of Appeals of the District of Columbia, in De Winter v. Thomas, 34 App. D. C. 80, 27 L. R. A. (N. S.) 634, speaking through Chief Justice Shepard, said: "It is a settled principle of equity that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property or fund a security for a debt or other obligation, creates an equitable lien on the property so indicated. 3 Pom. Eq. Jur. p. 1235. And when such intention is not express, but appears by necessary implication from the terms of the agreement, construed with reference to the situation of the parties at the time of the contract, and by the attendant circumstances, a lien will attach. Walker v. Brown, 165 U. S. 654-664, 17 Sup. Ct. 453, 41 L. Ed. 865, 870; Ingersoll v. Coram, 211 U. S. 335-368, 29 Sup. Ct. 92, 53 L. Ed. 208, 229. In other words, it must appear either expressly or by necessary implication that the other contracting party looked to the fund itself for payment, and did not rely upon the personal responsibility of the owner of the claim of which the fund was the result."

[2] Tested by the authorities cited above, and which it is conceived state the law applicable to the facts disclosed by the testimony quoted above, we think it clear that only one conclusion can be drawn from the

testimony of the witnesses Davis and Casey, which is that under the agreement there was an appropriation pro tanto of the fund in controversy to the amount of the fee contracted to be paid to Davis & Goggin, and to that extent Casey had surrendered control of the fund; that it was understood and agreed that they acquired an interest therein which should be paid by the bank or the receiver to Davis & Goggin, and it was not a mere personal promise on the part of Casey that he would pay the fee out of those moneys. It is true that Casey on cross-examination testified, "I agreed to pay them out of the fund"; but considering Casey's testimony as a whole, it is susceptible only of the construction that he considered to the extent of their fee Davis & Goggin had a specific interest in the fund, or right over the same, and to that extent his interest in and control over the fund had ceased and become vested in Davis & Goggin. Therefore they stood upon a higher plane than a creditor who has but the mere personal promise of his debtor that he will pay the debt out of a particular fund.

[3] It is immaterial whether the agreement between the parties be called an assignment, as it is by Davis, or an agreement to pay out of the fund, as it is termed by Casey, for, as stated by Mr. Pomeroy in the quotation above made: "The form or particular nature of the agreement which shall create a lien is not very material, for equity looks rather at the final intent and purpose rather than at the form; and if the intent appear to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and the property is so described that the principal things intended to be given or charged can be sufficiently identified, the lien follows."

We therefore hold that Davis & Goggin acquired an equitable assignment and lien upon the funds in the hands of the receiver to the extent of $1,250. In addition to the authorities above cited in support of this conclusion, see, also, Johnson v. Amarillo Imp. Co., 88 Tex. 505, 31 S. W. 503.

[4] The fact that the agreement was verbal does not impair its validity. Rollison v. Hope, 18 Tex. 446; Harris v. Campbell, 68 Tex. 22, 3 S. W. 243, 2 Am. St. Rep. 467; Clark v. Gillespie, 70 Tex. 513, 8 S. W. 121; Lumber Co. v. Smith, 151 S. W. 605.

[5] The question of right of priority of the parties now becomes important, and the doctrine that the first in time is first in right applies. Harris County v. Campbell, supra; Harris County v. Donaldson, 20 Tex. Civ. App. 9, 48 S. W. 791; Henke v. Keller, 50 Tex. Civ. App. 533, 110 S. W. 783; Olive v. San Antonio, etc., 27 S. W. 789; Brander v. Young, 12 Tex. 332; Lumber Co. v. Smith, supra. Applying this rule, interveners' rights are superior to those of the bank.

[6] It is unnecessary for us to determine whether or not, in a case of this kind, the equitable doctrine would apply which postpones the rights of a party first in time in favor of one who has subsequently acquired rights for value and without notice. This doctrine is invoked by the bank, it being asserted that it had made advances to Casey against the fund without notice of the rights or claims of interveners. We·find no evidence in the record that the assignment to the bank was made to secure advances then made or to be thereafter made. On the contrary, it is clearly apparent the assignment was taken to secure loans theretofore made to Casey. If it be that the bank has any rights under the Gilchrist assignment, which, as stated above, is not apparent from the record, this would not affect the conclusion herein reached, since it does not appear that any advances, upon the faith thereof, were made by the bank to Casey. The record is ·not clear whether the bank did or did not have notice of the claims of interveners; but, since they were not assignees for value, this question is of no moment.

The pleadings would not authorize a recovery upon any of the theories advanced under the remaining assignments. They are therefore overruled.

The decree of the lower court ordering distribution of the funds in the hands of the receiver, George D. Flory, entered on March 2, 1912, is in all respects affirmed, except as to that portion thereof which directs payment to be made to the State National Bank of El Paso, Tex., of that portion of the fund decreed to J. P. Casey by the judgment entered herein on May 4, 1910, and it is here now ordered that out of said funds and properties decreed to J. P. Casey by the judgment entered on May 4, 1910, the said receiver is directed to pay all unpaid court costs herein chargeable, and then pay to the interveners, Davis & Goggin, the sum of $1,250; and the balance, if any, pay over to said State National Bank.

Chief Justice HARPER did not sit in this case.

Reformed and affirmed.