**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**Clyde AUSTIN, d/b/a Southern Shippers Association, and W. R. Flocks and J. A. Smith, a partnership, d/b/a Western Wood Products Company, Appellees.**

No. 18780.

United States Court of Appeals
Fifth Circuit.

June 27, 1961.

Rehearing Denied July 28, 1961.

Carroll R. Graham, Houston, Tex.
(Hutcheson, Taliaferro & Hutcheson, Ar-

terbury, Hoover & Graham, Houston, Tex., Roy L. Arterbury, Houston, Tex., of counsel), for appellant.

Kenneth H. Aynesworth, Jr., Houston, Tex. (Aynesworth & Mann, Houston, Tex., of counsel), for appellees.

Before JONES and BROWN, Circuit Judges, and DE VANE, District Judge.

JOHN R. BROWN, Circuit Judge.

This appeal by the Railroad from a judgment entered on a reparation award made by the Interstate Commerce Commission presents three questions. The first is the matter of the statute of limitations. Second, there is the problem of whether the traffic consultant Austin (one of the plaintiff-appellees) had an assignment of a 50% interest in the award as distinguished from a mere contingency. The third, and most serious, concerns the admissibility under the Federal Business Records Act, 28 U.S.C.A. § 1732, of a Dun & Bradstreet report either as a basis for impeachment of the witness or as an admission of the party (Flocks, a plaintiff), or both.

The shipper was Western Wood Products Company, a Texas partnership. The partners were Flocks, J. A. Smith, and another who subsequently withdrew. The shipments giving rise to the claim occurred in 1952. The co-plaintiff Clyde Austin was a traffic consultant. Without presently determining the legal significance of such evidence it was uncontradicted that he served Western Wood in that capacity for a number of years and that it was agreed that he was to receive 50% of whatever savings or recoveries

were achieved by his efforts. Without a doubt it was his efforts here which produced the reparation award in suit. The record is vague on details, largely because this was all washed out in the agreed ICC award. But it warrants the conclusion that when Austin brought the facts to the attention of the carriers, two things resulted. There was, first, a suitable correction of the tariffs to prevent a problem as to future shipments. And second, it was acknowledged that some reparation should be made as to prior shipments. After negotiation it was agreed that the carriers would file with the ICC a proceeding in the customary form for permission to pay reparations in the specific sum of $2,659.92. The ICC, on this application, entered an award against the carriers finding a discriminatory overcharge entitling the shipper to reparation in the claimed sum and then ordered formally that the carriers "are * * * authorized and directed to pay * * * Western Wood * * * on or before September 27, 1955, the sum of $2,659.92 as reparation." [1] As reflected on its face this order was issued on and "dated at Washington, D.C. Jul 25, 1955."

The suit to enforce the award under 49 U.S.C.A. § 16(2) was filed September 27, 1956, within one year of the date required for payment (September 27, 1955), but more than a year from the "date of the order" (July 25, 1955) as 49 U.S.C.A. § 16(3) (f) literally specifies.[2] The carriers strenuously urge the plea of limitation which we discuss shortly. But alternatively a further defense was urged. The carriers [3] by formal

---

1. The ICC order concluded:
   "*It is ordered,* That the above-named defendants, as they participated in the transportation, * * * are hereby authorized and directed to pay unto complainant, * * *, on or before September 27, 1955, the sum of $2,659.92 as reparation * * *.
   "Dated at Washington, D.C. Jul 25, 1955.
   "By the Commission. * * *.
   Secretary."

2. 49 U.S.C.A. § 16(3) (f): "A complaint for the enforcement of an order of the commission for payment of money shall be filed in the district court or the State court within one year from the date of the order, and not after."

3. In addition to the Missouri Pacific Railroad Company, there were 12 other respondent carriers in the reparation proceedings. These were defendants in the suit filed below. In the final judgment entered by the court, it was ordered that "plaintiffs take nothing as against the

answer did not dispute the validity of the ICC award as such. On the contrary they formally admitted its issuance and validity. The defense was essentially one of payment or set-off. This plea was really that of the defendant Missouri Pacific Railroad Company. The answer alleged that Western Wood had assigned all of its assets, including this reparation claim, to Aviation Corporation of Texas and that Missouri Pacific had obtained a final judgment on February 13, 1956 against Aviation Corporation for $5,-320.88 for unpaid freights. Consequently, the answer claimed, Missouri Pacific was "entitled to set-off against any amount due the plaintiff's herein, the sum * * * awarded in the judgment * * *" against Aviation Corporation.[4]

The case therefore turned into a controversy whether Western Wood had assigned this reparation claim to Aviation Corporation. The Railroad's further contention that Austin's 50% fee interest was a contingency, not an assignment in the claim itself, likewise acquired some significance.

■■■ The first two questions may be quickly disposed of. We are clear that the suit to enforce the award was timely filed. It is a literalism in its most artificial extremity to regard—as the Railroad contends—only the literal words of § 16(3) (f) that fixes the period of suit as "within one year from the date of the order, and not after," note 2, supra. That approach on statutory construction is, at best, far from decisive. United States v. American Trucking Ass'n, 1940, 310 U.S. 534, at page 543, 60 S.Ct. 1059, 84 L.Ed. 1345; Florida Citrus Exchange v. Folsom, 5 Cir., 1957, 246 F.2d 850, at page 857; Fulford v. Forman, 5 Cir., 1957, 245 F.2d 145, at page 149. Subparagraph (3) (f) relates directly to § 16(1) and (2) which specify that the reparation order shall direct "the carrier to pay * * * the sum * * * on or before a day named"[5] and permits a suit against the carrier if the "* * * carrier does not comply with an order for the payment of money within the time limit in such order * * *."[6]

It is perfectly plain that Congress intended to do three things. First, the Commission was to prescribe a time by which the reparation order was to be paid by the carrier.[7] Second, the carrier was not required to pay prior to that time. And third, the person obtaining the award was to have a year in which to secure enforcement through judicial means if the carrier did not voluntarily comply. These policies would be frustrated were the time for suit measured

---

other defendants" but that "plaintiffs do have and recover * * * from the defendant, Missouri Pacific Railroad Company * * * $2,659.92 together with interest * * *." Supersedeas appeal bond was therefore filed by Missouri Pacific Railroad Company alone.

4. The validity and amount of Missouri Pacific's judgment against Aviation Corporation, rendered February 13, 1956, was stipulated. It was also stipulated that "All the Railroad Companies named in and affected by such * * * reparations order, other than the Missouri Pacific Railroad Company, have heretofore delivered to the Missouri Pacific Railroad Company all payments required of them, respectively, by such reparations order."

5. § 16(1). "If after hearing a complaint * * * the commission shall determine that any party * * * is entitled to an award of damages * * * the commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named."

6. § 16(2). "If a carrier does not comply with an order for the payment of money within the *time limit* in such *order*, the complainant * * * may file in the district court * * * a complaint setting forth * * * the order of the commission * * *." (Emphasis added).

7. The provision in § 16(1) directing the carrier to pay "on or before a day named" makes good railroad sense. Here there were 13 participating carriers. Each was required "as they participated in the transportation" to make reparation. See note 1, supra. Presumably the practice followed, as was done here, see note 4, supra, is for the participating carriers to remit their pro rata part to the initial or delivering carrier with whom the claim has been lodged.

by the initial date. The actual time available for filing suit would be something less than a year depending on the interval between the date of the issuance of the order and the prescribed date of payment. More than that, this would run counter to all notions of limitations which treats the beginning point as the time the judicially enforceable cause of action accrues. Concededly, suit could not have been filed prior to September 27, 1955. § 16(2). No right of judicial action having come into being prior to that time, the one-year period commenced on that date. That is the "date of the order." § 16(3) (f). Chesapeake & O. Ry. Co. v. Walton, 4 Cir., 1938, 99 F.2d 270; Standard Oil Co. of Cal. v. Davis, D.C.N.D.Cal.1925, 6 F.2d 236; Acheson Graphite Co. v. Mellon, D.C.N.Y.1927, 21 F.2d 562.

▄▄ On the issue of Austin's 50% interest, the Railroad has not met the burden of F.R.Civ.P. 52(a), 28 U.S.C.A., of demonstrating that the Trial Court's finding was clearly erroneous.[8]

It is important to bear in mind that there is no dispute between Austin, on the one hand, and anyone or all of the partner-assignors. It is attacked by an outsider whose interest admittedly arose long after this engagement was undertaken. The evidence certainly did not, as was true in Central National Bank v. Latham & Co., Tex.Civ.App.1929, 22 S.W. 2d 765, compel a finding that it was the intention of the parties that the award would first be paid directly to Western Wood with the payment subsequently of 50% thereof by Western Wood to Austin. It warranted the finding that Austin did —and was entitled to—look at the award itself for payment. Davis & Goggin v. State National Bank, Tex.Civ.App.1913, 156 S.W. 321.

But there is an additional basis for finding an assignment. Austin, as an ICC practitioner, not a licensed attorney, legitimately could render a service. But it was limited in nature and in point of time. He could prosecute the claim, as he did, before the ICC. But he could go no further. That means his work was finished. More than that, his work was well and successfully done. When the award was formally issued on July 25, 1955, effective September 27, 1955, the prior agreement to pay him 50% ripened into an equitable assignment of the award itself. The situation is comparable to that of an attorney's contingent fee which changes from an executory contract to an equitable interest upon performance of the engagement by the recovery of a judgment.[9] This right became fixed in the fall of 1955 and prior to the time the judgment was obtained by Missouri Pacific Railroad Company in February 1956. On the Court's findings Austin was the owner of 50% of the award and the judgment as to his 50% interest must be affirmed in any event.

▄▄ A more serious problem is presented on the evidence question. As we pointed out briefly, the Railroad asserted that Western Wood had assigned all of its assets to Aviation Corporation who had in turn assumed all liabilities. This was claimed to have occurred in June 1953. Neither Flocks nor Smith appeared on the trial, but their depositions were available and that of Flocks was offered. In a large measure it substantiated the basic contention of the Railroad that Western Wood had concluded an inter-company transaction by which

---

8. The Court found categorically that Austin, an authorized ICC practitioner "under a traffic service contract * * * was assigned a one-half interest in the claim and all sums recovered thereunder, and thereafter fully performed his obligations under the contract and represented Western Wood Products Company in connection with the [ICC] proceedings."

9. Coen v. Stout, Tex.Civ.App., 1952, 245 S.W.2d 971, at page 973; Kull v. Brown, Tex.Civ.App., 1942, 165 S.W.2d 1011, 1013; Northern Texas Traction Co. v. Clark & Sweeton, Tex.Civ.App., 1925, 272 S.W. 564; 7 C.J.S. Attorney and Clients § 187, p. 1070.

assets were transferred. There was no formal written contract of assignment nor was there any formal transfer. Flocks denied categorically, however, that this reparation claim was assigned. Flocks' testimony, taken as it was in 1958 five years after the occurrence, long after the partnership had any active business dealings, and with records of the partnership, Aviation Corporation, or both, scattered, incomplete, lost or of little help, was, at best, confusing and uncertain. But apart from the proffered exhibit excluded by the Court, the Railroad did not offer any evidence of its own. If Flocks' testimony was vague and confusing, the Court was nonetheless permitted to draw the inference against the Railroad since it asserted the assignment and assuredly had the burden of establishing it.

It was in this setting of confusing, rambling, spotty, disconnected explanations by Flocks concerning the dealings between Western Wood and Aviation Corporation that the Railroad proffered the questioned evidence. This was an excerpt from a Dun & Bradstreet, Inc. report dated August 24, 1954, on Aviation Corporation. The part specifically emphasized was in a brief paragraph [10] under "History" which reported that Flocks "also stated that this company [Aviation Corporation] purchased the assets and assumed the liabilities of Western Wood Products Company, formerly partnership in June 1953 * * *."

As a part of the proffer the Railroad produced a witness who testified he was an employee of Dun & Bradstreet, Inc. However, his exact position, responsibility, or authority was in no way revealed. What he did testify to, and more so, what he did not testify to, is of crucial importance. With but slight change in wording and none in substance, it was simply this in narrative form. Dun & Bradstreet, Inc. is in the business of compiling credit reports for use of commercial concerns. Approximately 95% of the information is obtained by interviews of the subject companies. Dun & Bradstreet has a file on Western Wood and Aviation Corporation. These files and papers are regular records kept in the regular course of the business of Dun & Bradstreet. The particular sheet offered is a credit report on Aviation Corporation. It reports what Flocks stated to the investigator. The investigator's name or identity is not known. Neither the witness nor the former head of the department can now be sure who the investigator was. The business of Dun & Bradstreet is preparing reports of this nature for transmission to other business concerns. Ordinarily people in the trade place considerable reliance on the reports of Dun & Bradstreet. In the usual course of its business the information in this proffered report would have come from an investigator who talked directly to Flocks. It is now impossible to ascertain who the investigator was. The proffered report was among its permanent records and was brought to Court pursuant to a subpoena.

When the exhibit was proffered the plaintiffs objected on the ground that " * * * it is hearsay, * * * no proper predicate has been laid for introducing it. The source of the information isn't before the Court. It is not the best evidence of the facts * * *." The objection was sustained.[11]

---

10. "October 9, 1953, W. R. Flocks, Vice-president, stated that this corporation now uses the unregistered trade style of Western Wood Products Co. and now maintains a branch at 3607 Yoakum Boulevard, Houston, Texas. He also stated that this company purchased the assets and assumed the liabilities of Western Wood Products Co., formerly partnership in June, 1953, however, he declined to state the consideration in-volved. He also stated that the corporation continues to own equipment at New Braunfels, Texas."

11. "The Court: I think the hearsay objection is good. We have had the testimony, the sworn testimony of Mr. W. R. Flocks, * * * in which he was interrogated by the attorneys on both sides and if we are to consider what Mr. Flocks had to say about it I think

Whether the paper was offered as a prior inconsistent statement impeaching Flocks' testimony, or as an admission by Flocks (a party) to prove the truth of the facts stated—i. e., the transfer of all assets—the paper as such was hearsay. At least it was in the sense that there was no person subject to cross examination to repeat what Flocks had said to the investigator. It is important to bear in mind, however, that if the paper was admissible as proof merely of the words uttered to the investigator, when the objection of hearsay was no longer good. This is so because of the peculiar fact that the person to whom the recorded statement is attributed is both a witness and a party. More than that, the recorded statement is contrary to his court-given statement, thus reflecting on credibility and, of greater significance, it is inconsistent with the theory of non-transfer of assets asserted on the trial, thus amounting to a classic admission.

In that situation one of the most troublesome problems under the Federal Business Records Act, 28 U.S.C.A. § 1732 (or similar statutes), is avoided. That problem relates to a writing made by an entrant who had a duty to record facts stated by a person who was not under a business duty to report. Is the paper admissible to prove the truth of the facts stated to the entrant when the initial declarant (informant) is not a party or a witness on the trial? Ordinarily, it would not be admissible.[12] But it is uniformly recognized that this is not so as to those statements which, contained in a record otherwise qualifying as a business record, are admissible for impeachment or as admissions against a party or both.[13]

Consequently, if this paper was admissible, what was stated on it became relevant, admissible evidence and the exclusion was erroneous. This brings into play the Federal Business Records Act [14]

---

we ought to confine ourselves to his sworn testimony, and I will sustain the objection.

"Mr. Graham [Railroad's counsel]: May I say one thing, Your Honor. I offer those under the provision of 28 USCA, Section 1732, which deals with the admission of business records into evidence.

"The Court: I don't think this is the sort of thing contemplated by that act. I don't think that act makes any record a loose way of getting in hearsay evidence. Mr. Flocks was interrogated under oath by the attorneys on both sides and if we are to consider what he has to say about it I think we should confine ourselves to his sworn testimony."

12. The problem is epitomized in the often cited case of Johnson v. Lutz, 1930, 253 N.Y. 124, 170 N.E. 517. See also, McCormick, Evidence § 286 at 602-3 and n. 10 (1954); Green, The Model and Uniform Statutes Relating to Business Entries as Evidence, 31 Tulane L.Rev. 49 at 61-62 (1956), discusses Johnson v. Lutz, the criticisms of it, and this general problem; so does Revised Business Entry Statutes: Theory and Practice, 1948 Col.L.Rev. 920 at 924, 926-27 (1948); see Polasky and Paulson, Business Entries, From Common Law to the New Uniform Rules of Evidence, 4 Utah L.Rev. 327 at 350-51.

13. McCormick, Evidence § 285 at 603, n. 12, § 290 at 611; Green, supra, 31 Tulane L.Rev. 49 at 62-63; Revised Business Entry Statutes: Theory and Practice, 1948 Col.L.Rev. 920 at 926-29.

It is sometimes said that in this situation the material is admissible not under a Business Records Act, but on some other recognized exception or heading. But this is not accurate where, as here, the statement—i. e., the words uttered—is proved not by one who overheard them, but by a paper.

14. 28 U.S.C.A. § 1732:

"(a) In any court of the United States * * *, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight,

since the Texas rule [15] is, for our problem, no more liberal as a source of admissibility. F.R.Civ.P. 43(a). So long as regard is paid to the indispensable fundamental trustworthiness of the proffered record, the statute " * * * should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed." Palmer v. Hoffman, 1943, 318 U.S. 109, at page 115, 63 S.Ct. 477, at page 481, 87 L.Ed. 645.

■■■ In the approach of the Model Act trustworthiness comes from a record (1) regularly made in the course of a business, (2) if it is a part of the regular course of that business to record the event or transaction at or near the time of its occurrence. Most frequently the inquiry concerns the regularity of the making of that record in a particular business.[16]

Meager as the qualifying evidence is, we may assume, without deciding, that the proffered exhibit met this phase of the statutory standard. Our disposition of the case makes it unnecessary for us to determine whether, as contended by the Railroad, the evidence constituted a sufficient showing that it was an essential part of the very business of Dun & Bradstreet to interview representatives of business companies under credit investigation and that such information was evaluated and used in making credit reports thereafter to clients, who, in turn, relied on such reports in making important business decisions.

■■■ For, assuming that phase to be met, there is a complete void in the evidence to qualify the paper as a business record exhibit to establish the fact that these words were spoken by Flocks in 1953. The evidence showed but three steps. It was the regular course of business (1) for the investigator to interview; (2) for the investigator to report his interview; and (3) at some later time a credit report would be issued based on all information including the report in step (2). But there was no evidence whatsoever concerning what the investigator regularly did after the interview. For the interview-information to be embraced in the final credit report, it is apparent that some report of it had to have been made. But when? And under what circumstances? And in what manner?

It may be that if properly developed the evidence would have shown that on return to the office the investigator would regularly make a memorandum setting forth the substance of the interview; and that in making up the final credit report by others, such memorandum would be relied upon and then discarded. But the evidence offered did not, nor did it even purport to, do this.

■■■ The requirement that the regular course of business included a timely

---

but such circumstances shall not affect its admissibility.

"The term 'business', as used in this section, includes business, profession, occupation, and calling of every kind.

"(b) [refers to destruction, use of microfilm copies, etc.]."

As amended Aug. 28, 1951, c. 351, §§ 1, 3, 65 Stat. 206.

This is based on the Model Act, see McCormick, § 289 at 606, n. 6, 7.

15. Tex.Civ.Stat. art. 3737e (Vernon, 1960 Supp.) ; McCormick, Evidence, § 289 at 608 (1954) ; see Ray, Business Records—A Proposed Rule of Admissibility, 5 Southwestern L.J. 33 (1951).

16. Green, supra, 31 Tulane L.Rev. 49 at 57–59. This and Palmer v. Hoffman, supra, are frequently analyzed in terms of the three different approaches summarized in Criteria for Admissibility Under the Federal Business Records Act, 45 Virginia L.Rev. 717 at 722–26 (1959) ; see Polasky and Paulson, supra, 4 Utah L.Rev. 327 at 343, 351; McCormick, supra, §§ 281 et seq. at 596. See also Standard Oil Co. of California v. Moore, 9 Cir., 1957, 251 F.2d 188, at page 213; United States v. United Shoe Machinery Corp., D.C.Mass., 1950, 89 F.Supp. 349, at page 355; Smith v. Bear, 2 Cir., 1956, 237 F.2d 79; Heebner v. C. I. R., 3 Cir., 1960, 280 F.2d 228; White v. Zutell, 2 Cir., 1959, 263 F.2d 613; Hartzog v. United States, 4 Cir., 1954, 217 F.2d 706; Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725; Matthews v. United States, 5 Cir., 1954, 217 F.2d 409, at pages 413–415.

recording is not to be applied with any technical niggardliness. Dealing with business records, account must be taken of practical considerations. This second element is not to be judged, then, by arbitrary or artificial time limits, measured by hours or days or even weeks. That will depend on the nature of the information recorded, the immutable reliability of the sources from which drawn and similar factors.[17]

■ Here the crucial "fact" to be proved is the words uttered by Flocks in June 1953. The paper is offered to prove them precisely and not merely the "impressions" which the investigator gained. The interview took place in June 1953. So far as the evidence is concerned, the first and only record was made in August 1954. When the fact to be proved is the utterance of specific words—or the equivalent substance of them as would be permitted to a witness on the stand—judicial experience with the whole problem of recollection proves that this must be done very shortly if it is to have any reliability. The more it is a part of the regular duties of a person to interview many people in many different companies on many varied situations, the more imperative is the necessity for an early recording.

■ In the limited description afforded by the evidence concerning this fact-gathering-recording-process, this proffered credit report does not carry with it a sufficient conviction of trustworthiness. It is perhaps a paradox that it is certain that there must have been steps taken by Dun & Bradstreet which are not described by the testimony of the authenticating witness. But whether such unknown steps are such as to bridge the gap between the interview in June 1953 and the first and only recordation of it in August 1954 is for us the sheerest speculation. And so it was for the

District Judge to whom much considered and wise discretion must be accorded as he deals with the infinite variables of evidence.

Since the sufficiency of the Court's findings that the reparation claim had not been assigned was attacked on no ground other than the exclusion of this evidence, the result is that the Railroad's defense fails both as to the partners and to the traffic consultant Austin.

Affirmed.

17. See Green, supra, 31 Tulane L.Rev. 49 at 60; Revised Business Entry Statutes: Theory and Practice, 1948, Col. L.Rev. 920, at page 923, n. 22; McCormick, supra, § 285 at page 601; Masterson v. Pennsylvania Ry. Co., 3 Cir., 1950, 182 F.2d 793, at page 797; Croll v. John Hancock Mutual Life Ins. Co., 3 Cir., 1952, 198 F.2d 562, at page 565; United States v. United Shoe Machinery Corp., D.C.D. Mass., 1950, 89 F.Supp. 349, at page 354.