### COLLEPS et al. v. GEORGE W. SMITH LUMBER CO.

(Court of Civil Appeals of Texas. Beaumont. March 2, 1916. Rehearing Denied April 6, 1916.)

1. MECHANICS' LIENS ⬥73(2) — AGREEMENT OF OWNER—HOMESTEAD.

A mechanic's lien on a homestead can be acquired only by strict compliance with article 5631, Vernon's Sayles' Ann. Civ. St. 1914, requiring the execution of a written contract signed by the owner and his wife, acknowledged by her before the material or labor is furnished and recorded in the office of the county clerk.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 88; Dec. Dig. ⬥73(2).]

2. HOMESTEAD ⬥97 — EQUITABLE LIENS—SUBCONTRACTORS.

In the absence of such contract, those who furnished labor or material to the contractor have no equitable lien on the homestead or on the money due the contractor for the improvement.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. § 154; Dec. Dig. ⬥97.]

3. LIENS ⬥7 — EQUITABLE LIEN — EQUITY FOLLOWS THE LAW.

Under the maxim that equity follows the law, one who by noncompliance with article 5631, Vernon's Sayles' Ann. Civ. St. 1914, fails to secure a mechanic's lien cannot claim an equitable lien.

[Ed. Note.—For other cases, see Liens, Cent. Dig. §§ 26–28; Dec. Dig. ⬥7.]

4. ASSIGNMENTS ⬥48—EQUITABLE ASSIGNMENTS—REQUISITES.

To create an equitable assignment of a fund, there must be delivery actual or symbolic, or some act to place the fund beyond the control of the assignor, and a mere promise or agreement to pay a debt out of such fund is not an equitable assignment.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 133; Dec. Dig. ⬥48.]

5. ASSIGNMENTS ⬥52—EQUITABLE ASSIGNMENTS—REQUISITES.

The contractor agreed to pay for material and labor out of the money to be paid him when the work was completed. *Held* not an equitable assignment of the fund, since it remained under the contractor's control.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 107–111; Dec. Dig. ⬥52.]

Appeal from District Court, Jefferson County; W. H. Davidson, Judge.

Action by the George W. Smith Lumber Company against C. I. Colleps, in which C. A. Logan and others intervene. From judgment for plaintiff and order denying a new trial, interveners appeal, defendant joining therein. Affirmed.

Barry & Burges and V. A. Collins, all of Beaumont, for appellants. Greer, Nall & Bowers, of Beaumont, for appellee.

BROOKE, J. This suit grew out of garnishment proceedings instituted by appellee, George W. Smith Lumber Company, against A. J. Montagne and J. M. Eastham, garnishees, alleging that Montagne and Eastham were indebted to C. I. Colleps against whom appellee, George W. Smith Lumber Company, had instituted a suit for debt. For the purpose of this suit it was admitted that said C. I. Colleps owed appellee the debt, that same was due and unpaid, and that the garnishment proceeding against said Montagne and Eastham was sufficient to fix a lien in favor of appellee on any fund belonging to said C. I. Colleps in the hands of said Montagne and Eastham if said sum was subject to garnishment as against the equitable rights asserted by the other appellants connected herein with C. I. Colleps. The said Montagne and Eastham answered the garnishment proceedings, saying, in effect, that they contracted with C. I. Colleps to build certain improvements on a house, and that they held $580 of said contract price of said improvements in their hands subject to said contract, but answered further that said other parties claimed said funds, to wit, C. A. Logan, R. M. Carter, Lon Hefler, Neches Electric Company, Beaumont Shingle & Lumber Company, and J. T. Boon, and prayed that said other parties be vouched in to determine in one proceeding the ownership of said money. The appellants filed answer claiming, in effect, that they were the owners of certain specific interest in said fund by virtue of an equitable assignment of same made to them by C. I. Colleps before they furnished material for said improvements or did any work thereon, and that, relying on such equitable assignment of an interest in the contract money, they furnished material and labor for said improvements.

Appellee joined issue on appellants' plea, and the cause was tried by the court without a jury, and resulted in a judgment in favor of the appellee fixing and foreclosing his garnishment lien and rendering judgment against the principal and sureties on a replevin bond which had been filed by Colleps, through which he had been given possession of said fund. It may be added that the sum of $584.35 was due C. I. Colleps by Montagne on an oral agreement to erect for the said Montagne an addition to his home in the city of Beaumont, and that the George W. Smith Lumber Company had prior to the trial of the garnishment suit obtained judgment on its claim.

Appellants filed their motion for new trial, and are now properly before this court on errors complained of in the trial court.

The first assignment of error assails the action of the lower court in holding, finding, and concluding that the furnishing of material and labor by these defendants would not constitute an equitable lien against the fund in controversy as against the claim of the George W. Smith Lumber Company, whose claim was based upon a judgment

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

which the said plaintiff had against the defendant, C. I. Colleps, and had no connection with the building or fund in controversy. The proposition advanced by appellants under this assignment is that parties furnishing material for the construction of buildings or improvements and parties doing work or labor on same have a lien on such building or improvements superior to any lien that can be fixed by any common creditor of the owner of the building or improvements, or, if the money is on deposit to pay for such building or improvements, the parties contributing material and labor have an equitable lien on said money superior to any lien that can be fixed by any creditor of the owner of the building or improvements.

[1] There is only one way known to the law by which one who furnishes material or labor for the erection of, or labor made upon, the homestead, to fix and secure a lien upon the same. Article 5631, Vernon's Sayles' Statutes, provides:

"When material is furnished, labor performed, erections or repairs made upon a homestead, if the owner thereof is a married man, then to fix and secure the lien upon the same, it shall be necessary for the person or persons who furnished the material or performed the labor, before such material is furnished or labor is performed, to make and enter into a contract in writing, setting forth the terms thereof, which shall be signed by the owner and his wife, and privily acknowledged by her, as is required in making sale of homestead. And such contract shall be recorded in the office of the county clerk in the county where such homestead is situated, in a well bound book to be kept for that purpose: Provided, when such contract has been made and entered into by the husband and wife and the contractor or builder, and the same has been recorded, as heretofore provided, then the same shall inure to the benefit of any and all persons who shall furnish material or labor thereon for such contractor or builder."

Under the above article it has been held that an express agreement in a mechanic's contract that he shall have a lien upon the homestead as provided by law will not create a lien until all the requirements of the statute have been complied with. Cameron v. Marshall, 65 Tex. 7; Building & L. Association v. Logan, 33 S. W. 1088.

It has been held also that the material furnished for the erection of a building or a homestead will not support a mechanic's lien in the absence of a written contract for such material, signed by the owner and his wife, as required by Const. art. 16, § 50. Republic Guaranty & Surety Co. v. Wm. Cameron & Co., 143 S. W. 317; Kalamazoo Nat. Bank v. Johnson, 5 Tex. Civ. App. 535, 24 S. W. 350; Security Mortgage & Trust Co. v. Caruthers, 11 Tex. Civ. App. 430, 32 S. W. 837.

In the instant case it was admitted that A. J. Montagne was married; that he was a son-in-law of Mally Eastham; that an addition was being erected to his home in the city of Beaumont under a verbal agreement as above set out.

We are cited by appellants to the following cases, as supporting their contention: Roberts Summerville et al. v. Jesse King et al., 98 Tex. 340, 83 S. W. 683, in which the court uses the following language:

"There is no evidence of any homestead right in the land in question prior to the making of the contract between Hanks and wife [it should be Summerville and wife], and L. R. Jones for the building of the house."

In the case of Telephone & Telegraph Company et al. v. Kellogg Switchboard & Supply Company et al., 132 S. W. 963, the question of homestead was not raised in any way, and in the case of Howell et ux. v. McMurray Lbr. Co., 132 S. W. 849, the court says:

"Other than as above noted, no question is made as to the form or sufficiency of the contract or of the proceedings thereunder, and, the consent of the wife having been given in the manner required by section 50, art. 16, of the Constitution, authorizing the forced sale of the homestead, we think the court below properly adjudged the lien as prayed for."

[2, 3] We have been unable to find any case in the Texas decisions even remotely holding the contrary doctrine. We therefore conclude that, in so far as the house or improvements made thereon under the agreement in the instant case are concerned, no lien, either legal or equitable, arose or could arise in favor of the mechanic or materialman or against the funds paid into court under said agreement. If we understand appellants' position, it is stated in the brief that they had a lien on improvements, but that, inasmuch as the money was tendered to pay for all improvements, and inasmuch as the material was furnished and labor performed with the understanding that it was a turnkey job, and no payment was to be made until the job was completed, by reason of the premises an equitable lien arose in their favor upon the said fund. We cannot agree with the contention of appellants. Equity follows the law, and neither by the contract or the agreement or any provision thereof could a lien arise upon the building or grounds, and therefore we are unable, by any process of reasoning, to find how any equitable lien could arise against such funds. Appellants could have protected themselves by a compliance with the statute with reference to fixing liens in such cases, and, as they have not seen fit to do so, they must abide the consequences.

The action of the lower court is assailed in holding, finding, and concluding that the verbal agreements had between the defendant, C. I. Colleps, and the materialmen and laborers impleaded herein was insufficient to constitute an equitable assignment of the fund in controversy, which has been set aside and designated to pay for such material and labor, and this is followed by the proposition that, where a party having a contract for the construction of improvements procures the material and labor to construct such improvements by such statements or promises to the parties furnishing same, they shall

have their pay out of money coming to him on the specific contract, that such understanding on the part of the parties would constitute an equitable assignment of the contract fund to the extent of the value of such material furnished or labor done, and that no particular form of words is necessary to constitute such equitable assignment. In order to determine what agreement, if any, or understanding, if any, was made between Colleps and the people furnishing the material, it will, perhaps, be necessary to detail the conversations as shown by the record.

Colleps testified:

"The lumber that went into that house I bought myself from the Gray Lumber Company —the Beaumont Shingle & Lumber Company. I got the hardware from the Smyth Lumber Company, the plaintiff in this suit, which I think amounted to $11.45; I have got their bill. Mr. Booth put the roof on for me, and the Bettis Manufacturing Company furnished the millwork. The Neches Electric Company done the wiring, Smyth Lumber Company the hardware, and R. M. Carter the painting. I had no contract with the Beaumont Shingle & Lumber, only that they would furnish the stuff, and no money until the building was accepted by the architect and Eastham. Mr. Chambers, who is the bookkeeper there and salesman, I told him I was going to build a house. I said: 'Mr. Chambers, this is a "turnkey" job, and there won't be a cent drawed by me until it is complete.' He says: 'All right, Mr. Colleps; go ahead; I will send you the stuff.' Mr. Carter the same way; he furnished the paint, canvas, and paper, with the understanding that when the job was done he got his pay. I told Mr. Booth when he come out there to do the work, I says: 'Mr. Booth, this is a "turnkey" job.' And he had made me a price on his part of the work, the roofing and metal work. 'Is that all right?' And he said: 'It is.' And he went on and did the work. That was Mr. Booth, for the roofing and metal work. And Mr. Carter, the contract I made with him; he was the low man on the work. I said: 'Mr. Carter, this is a "turnkey" job.' I says: 'I am no millionaire. When I settle with those men, you get your money, and I don't get a cent until the job is done. Is that satisfactory?' And he says: 'It is.' Mr. Carter contracted the work and furnished the material and labor for $75. I went to Mr. Chambers, * * * and I said: 'Mr. Chambers, what kind of a deal do you want to make?' * * * And he said: 'Well, Colleps, whatever will suit you?' And I says: 'Well, all I can do is to have you wait until I get through with the job.' I says: 'It is a "turnkey" job, and I don't get a cent until I turn over the job.' And he says: 'That's all right.' Mr. Hefler and I principally done the job. I told Mr. Hefler—he had been working with me for several years—I says: 'Mr. Hefler, this is a job that won't pay me a cent until the job is complete; can you work three or four or five weeks without any money?' And he says: 'I will work for you until the house is complete, without any money.' And he did. Mr. Hefler and myself done the work on that house I done the biggest part of it myself."

On cross-examination he said:

"I had a conversation with Mr. J. T. Booth with reference to putting on the roof. I made a contract with him for Montague. I agreed on the amount of the contract. I didn't tell him no fund that this money would be paid out of. I just told him he would get his money when I got paid. It was a 'turnkey' job. I wanted to know if Mr. Booth was going to do my work and wait until I got paid, and I asked him the question, and he said: 'It is all right; I will

go ahead with it.' I was to pay him out of my money. I am no millionaire; I have no big bank account. I told him I was going to pay him when I got my money for that job. I told him I was going to pay him out of that particular money, out of that job. He said it was all right. I haven't paid him. * * * The arrangement that I had with the Neches Electric Company was simply that I told them to go ahead with the work if they wanted to wait until I got through and paid them out of the contract money in this case, the money that I was to get from Montague."

In reply to questions by the court this witness testified:

"I told them it was a 'turnkey' job, they all understand that, you know, and when I got my money out of the contract I would pay them, and they understood it, I think, that way. I told them it was a 'turnkey' job, there would be no money until the job was complete and satisfactory and the work had been done, and I wanted them to wait until the job was completed and O. K.'d and I got my money, and they agreed to do it. That's all that was said about it."

"I was to draw the money myself when the job was complete. The money was to be paid over to Mr. Montague. I did give one order on the job to the Bettis Manufacturing Company, on that millwork, but they didn't get it out of Montague."

Carter testified:

"I am the Carter who did some work on Mr. Montague's house. I painted and papered. I did that work by contract. I wrote up a contract and give it to Mr. Colleps, what I would do the work for, but I couldn't tell you the date. I have no written contract; Mr. Colleps and I never signed a contract. The contract I had with Mr. Colleps was verbal. I was to do that work for $75 and furnish the material. I knew Charley Colleps at the time I agreed to do that work. Mr. Colleps told me when I made the contract, he says: 'Now, Mr. Carter, this is a "turnkey" job, and when the job is completed and O. K.'d I will pay you your money.' Well, I knew Charley Colleps didn't have much money, and I knew very well that he paid me for every other job that I done, and I told him: 'All right, Charley; I will do that on that consideration, and I will get it out of the job.' Mr. Colleps was to pay me when he got his money, and my work was to be accepted along with the rest of the job. I never bargained with Mr. Eastham and Mr. Montague; I bargained with Mr. Colleps."

Booth testified:

"My business is tinwork, tin sheet, iron cornice work, and roofing. I know Mr. C. I. Colleps. I have had contractual relations with him. I put the roof on and did some tin sheet work on this Eastham job. I had a verbal contract with Mr. Colleps. I built the roof originally; put on the entire roof. When they did the additional work, the job was let to Mr. Colleps. I gave Mr. Colleps an estimate what the work would cost him, and he gave me the work. On account of not knowing Mr. Colleps—that being the first time I ever saw him to know him; he was a stranger to me—the question of payment for the work was brought up. He told me that it was a 'turnkey' job, and he would not get a cent until the work was finished; that, if I would complete the work and wait until he got his money on the contract, until the contract price was paid to him, he then would pay me. Knowing that the work was being done for Mr. Eastham, I didn't question Mr. Colleps at all, although he was a stranger to me, but I thought that my money was perfectly good. He told me it was a 'turnkey' job, and when he got his money he would pay me. I did the work because I was hunting

work, wanted a profit on it, I make my living that way, I thought the money was good. Mr. Colleps was a stranger to me, and that was the only conditions on which I would do the work, that I was to get my money when he got his, and, being well acquainted with Mr. Montagne and Mr. Eastham, I knew if there was any doubts of my getting it I could go to them before it was paid out. I thought I would get my money out of the money that Mr. Eastham agreed to pay for this work on the contract on that particular job."

On cross-examination he testified:

"I took Mr. Collep's word for the fact that he would pay me after Eastham paid him. If he put the money down in his pocket, then I had nothing."

Hefler testified:

"Mr. Colleps stated: 'You come up there and go to work with me on the Mally Eastham job, Hefler.' And he said: 'I will tell you what I want you to understand. This is a "turnkey" job, I can't pay you until the job is done.' And I says: 'All right, Mr. Colleps; I would rather work there a few weeks and get it all in a lump than in little dribble-drabbles.' I didn't need any money at home at the time. There was nothing more said about how he was to pay me, except Mr. Colleps said it was a 'turnkey' job. I understood we were to get our money through Mr. Eastham. That was the condition on which I worked on that job, to get our money through Mr. Eastham, and when we asked for it, Mr. Eastham was to come in a few days and pay us, but it dilly-dallied along, and we found out there was some trouble about the matter. * * * Mr. Colleps said we was to get it through Mr. Eastham. Mr. Colleps was to pay me. I suppose Mr. Eastham was to pay Mr. Colleps. I believe if Colleps ever makes it he will pay me whether Eastham pays him or not. Colleps owes me yet for that amount, and I think he will pay me. I have worked for him and his brother for several years. He has always paid me, whether he got the money out of the job or not."

Chambers testified:

"I am secretary of the company [Beaumont Shingle & Lumber Company]. Mr. Colleps told us we would get our money as soon as the job was completed. I understood there was nothing to draw on the job until it was completed, and, when the job was completed, that the money would be turned over to us. I understood that the money was coming through Mally Eastham on the job, and, when the job was complete, he would have Mr. Montagne issue a check for the lumber. I looked to Mr. Montagne for my money; in fact, before the job was done, I went down to see Mr. Montagne. I only looked to Colleps to verify our records, and I looked to Montagne and Eastham for our money."

On cross-examination he said:

"I did not have more than one or two conversations with Mr. Colleps that I remember; I don't believe he was in the office more than one time. * * * I told him [Logan] that Colleps would settle with me. I don't remember telling him to go ahead and settle with Colleps and that I had no claim, because I did have a claim. I don't remember whether I told him to settle with Colleps or not. He asked me whether it would be all right to settle with Colleps. I didn't know that there was any trouble about the job at that time. I don't remember just what the conversation was between Mr. Logan and I. I told Mr. Logan the amount of our account on that job, and then I believe if the money had been turned over to Mr. Colleps he would have paid me. Under the agreement I had with Colleps I expected Montagne to issue a check for it, because that is the way most of it was handled. * * * I don't remember just how many times we have sold Mr. Colleps lumber; we have sold him a number of different times. Most of the lumber he bought he paid cash for it. I always look to the owner of the building. Mr. Colleps does not come up there and tell me the owner will pay me; this one was a different proposition. The bill I furnished Mr. Colleps he said he only got an estimate of so much a week, and we would go to the man together, and he would turn over the money to me. In a way I did look to the owner of the building in that instance; that the money would be turned over in my presence, and, while there was no agreement, it was always done. It was not the same thing in this instance, because this was a 'turnkey' job, and I was to get my check from Mr. Montagne, that was the original agreement, and when Mr. Logan talked to me I told him when the money was turned over to Mr. Colleps I believed he would pay me. I don't remember I went into details and told Mr. Logan I would get my money direct; I don't think it was necessary. I stated that I didn't state to Mr. Logan that we would not have any claim, because we did have a claim. I did not say to Mr. Logan about the check being payable to me. I was then looking to Mr. Colleps, because I knew he would pay me. The question of trusting Mr. Colleps was not reached when he first came up there. If Mr. Colleps hadn't said, 'I will pay you as soon as the job is completed,' I would have trusted him."

Upon being asked that Mr. Colleps testified on the stand that Mr. Colleps said he would pay him, he was mistaken about what the contract was, the witness stated:

"Well, I don't know what Mr. Colleps testified. The contract was just like I have stated to you, because he O. K.'d the bill; we checked up the credits on the bill and he O. K.'d it. The first conversation was that the money would be turned over to us when the job was completed, and I informed him that he should have Mr. Montagne issue the check; that is what he told me when he came to get the estimate. I don't know whether he told me at the time the order was given or not; I don't remember. He didn't tell me that as soon as the lumber was sent out Mr. Eastham would give me a check. He told me that when the job was completed, if I preferred, that Mr. Montagne would issue the check to me. I don't remember whether he had given the order at that time. * * * But, when the order was placed with me, he came to me and told me, if I would send the lumber out on that kind of an arrangement, why, it was perfectly all right, to go ahead and send it out. When the order was placed with me, I understood where it was going, and he didn't tell me in the beginning; I am sure he didn't. When the order was placed, he told me how the settlement was to be made; it was a 'turnkey' proposition, and that he was building the house for Mr. Montagne. He said if I would prefer it, Mr. Montagne would give me a check. I told him it was perfectly satisfactory. He came in there to place the order with me, and I asked him where the lumber was to go, and he told me it was going to Mr. Montagne's, and I think he told me voluntarily it was a 'turnkey' proposition, and I wouldn't get any money until the house was completed; and he says, 'Now, if you prefer it, I will have Mr. Montagne send you a check direct,' and I said, 'That will be perfectly satisfactory.'"

Logan, the architect, testified:

"When I supervise the contract I do not issue the check for the material myself. I audit the account. In this case I called up the materialmen and asked them what they wanted to do in the matter, and, if they tell me they want their money held out, then I will do it. Mr. Chambers told me it was all right; to go ahead and pay Colleps. I gave Colleps his es-

timates. I had two or three conversations with Mr. Booth. I understood myself that it was a turnkey job. It was wholly within my hands as to when the money was to be paid, because I was the supervising architect, and it was my duty to accept the work. I did not understand from conversation with Mr. Chambers that he was looking to Mr. Montagne for his pay on this material. I called him up and asked him about that. I did not tell Mr. Walder or Mr. Nall, or any of the agents of the Smyth Lumber Company, that Mr. Eastham owed this money to Mr. Colleps and if they would file a suit they would catch it."

[4] The above is almost a complete résumé of the testimony. It has been said that a mere promise, though of the greatest and most solemn kind, to pay a debt out of a particular fund, is not an assignment of the fund, even in equity, and a mere agreement to pay out of said fund is not sufficient; something more being necessary. In order to make an equitable assignment, there should be an equitably constructive appropriation of the subject-matter as to confer a complete and present right in the party meant to be provided for, even where the circumstances do not admit of its immediate exercise. If the holder of the fund retain control of it, it is fatal to the claim of the assignee. There must be some character of delivery, actual or symbolic, or some act to place the fund beyond the control of the assignor. There must be a perfected contract between parties intended to vest in the assignee a present right, even where the circumstances do not admit of its immediate exercise.

[5] We have examined carefully all the authorities available, using our best efforts to find some decision which would be authority for the proposition that appellants either had a lien on the fund or that there was an equitable assignment of the same, but we are unable to discover in any of the text-books or the decisions anything to warrant such a conclusion. The fund was under the control of Colleps. The fact that he promised the appellants that they would get their money when he got his money out of the job would not be an assignment, equitable or otherwise, of any interest in the fund. Colleps had not parted with the power of control of the fund, and even a direction by him to apply certain funds to the payment of a debt would not operate as an equitable assignment, for the reason such direction, even until acted upon, might be revoked. A promise to these appellants would only be an agreement to pay their debts out of a certain fund. It would not be sufficient to transfer any control of the fund or any interest in the fund. The appellants would receive at the hands of this court, and are entitled to receive, by virtue of the peculiar circumstances and the fact that a hardship will be cast upon them, the most careful consideration of their rights.

In the case of Adoue v. Blum, 6 Tex. Civ. App. 289, 25 S. W. 335, the following language is used:

"The district court held that the mere instructions given to the bank to transmit the balance due him to Adoue & Lobit, and the telegram of the same date, as the instructions from Weiss to Adoue & Lobit, did not constitute either a legal or equitable assignment of the funds to Adoue & Lobit; and in this we fully concur. We think this question is settled by the decision rendered by the Supreme Court of this state in the case of Wallis v. Taylor, 67 Tex. 431 [3 S. W. 321]. The judgment of the same court in its recent decision in Austin in the case of the Alliance Milling Company [86 Tex. 401] 25 S. W. 614 [24 L. R. A. 369], is to the same effect. The funds in the bank at the time of the institution of Adoue & Lobit's suit were subject to the control of Weiss, and were therefore subject to garnishment at the suit of Blum or any other creditor of Weiss."

We are constrained to hold in this case that there was no assignment of the funds, either legal or equitable, by Colleps to the appellants. Neither had they a lien which arose in law or equity from the funds.

Therefore the holding of the lower court and the action of the same was without error.

Appellants' assignments are in all things overruled, and this cause affirmed.

It is so ordered.