## CLARA V. APPEL ET AL. v. S. P. CHILDRESS ET AL.

### Decided February 10, 1909.

**1.—Trespass to Try Title—Warrantor—Appeal Bond—Obligees.**

Where, in trespass to try title, the warrantor of the defendant's title is a party defendant and the judgment is in defendant's favor, the warrantor is a necessary obligee in the appeal bond.

**2.—Appeal—Practice—New Appeal Bond.**

When an appeal bond is defective in that it is not made payable to all the parties interested in the judgment appealed from, a new appeal bond may be filed within the time and upon terms specified by the Appellate Court.

**3.—Trial without Jury—Judgment—Presumption.**

When a case is tried before the judge without a jury and the judge does not file his conclusions of fact, the Appellate Court will adopt and take as true any theory or state of facts which finds support in the evidence favorable to the judgment.

**4.—Statute of Limitation—Enclosure without Use.**

The enclosure of land without use of the same is not sufficient to set the statute of limitation in motion against the owner.

**5.—Limitation—Use and Possession—Evidence.**

Under a plea of title by limitation under the ten years statute, evidence as to the possession and use of the land in controversy, considered, and held sufficient to support a finding in favor of such plea.

**6.—Trial without Jury—Credibility of Witness.**

A trial judge sitting without a jury must pass upon the credibility of the witnesses, and, when the evidence is conflicting, his findings of fact although contrary to the positive testimony of one or more witnesses will not be disturbed by the Appellate Court, especially when said testimony relates to a conversation which took place many years before, and the other party to the conversation is dead.

**7.—Title—Inventory of Estate as Evidence.**

The fact that a certain tract of land was not included by an administrator in the inventory of the estate, is not conclusive evidence that the decedent did not claim title thereto. Such fact is a mere circumstance to be considered by the jury upon an issue as to title or claim.

**8.—Limitation Against Heirs.**

When the statute of limitation has begun to run against an ancestor, it will continue to run against his heirs after his death, notwithstanding disabilities of the heirs.

**9.—Limitation—Will—Executor—Devisee.**

Where a testatrix designated her executor as a "trustee," and stipulated in the will that the property devised to her children should not vest in them

but should be "retained" and "kept" by her executor or trustee; that the executor or trustee should distribute the property among the devisees at a time named, and said executor or trustee was given full discretion in the control and management of the property, with power to sell and convey the same, it will be held that the will vested the title to the property in the executor, and that the statute of limitation would run against the title of the devisees while the property was in the hands of the executor.

Appeal from the District Court of Medina County. Tried below before Hon. R. H. Burney.

*C. C. Harris, H. E. Hass* and *V. H. Blocker,* for appellants.—As to the effect of the will of Ann C. Baldenger: Haby v. Fuos, 25 S. W., 1121 and 1122; Govan v. Bynum, 43 S. W., 319 and 320; Cook v. Caswell, 81 Texas, 684; Beaty v. Clymer, 75 S. W., 541; Wiess v. Goodhue, 83 S. W., 178 to 181.

As to adverse holding by Hutchison and Kilgore and Strait: Hunter v. Malone, 108 S. W., 710 to 714; Satterwhite v. Rosser, 61 Texas, 166; Bracken v. Jones, 63 Texas, 184; Evans v. Templeton, 6 S. W., 843; Hurley v. Lockett, 12 S. W., 215; Mhoon v. Cain, 14 S. W., 24; Nolan v. Mundine, 79 S. W., 638; Sayles' Stat., art. 3349; Warren v. Frederick, 18 S. W., 750.

*De Montel & Fly,* for appellees.—Appellants are barred by the statute of limitation of ten years, notwithstanding the coverture and life tenancy of Clara V. Appell, because at the time 'the cause of action accrued, the legal title to the property in controversy was' held by Andrew J. and Henry A. Baldinger, executors and trustees under the last will of Ann C. Baldinger, for the benefit of the said Mrs. Appell and her children, and the statute of limitation having commenced to run against the said trustees and completed the bar during the trusteeship, it also barred all the right of action on the part of their *cestui que trusts.* Dulin v. Moore, 70 S. W., 742; Thornton v. Zea, 55 S. W., 799; Collins v. McCarty, 68 Texas, 150; McAdams v. McAdams, 32 S. W., 87; Patten v. Herring, 29 S. W., 390; McClelland v. McClelland, 37 S. W., 350.

JAMES, Chief Justice.—The judgment was that plaintiffs (appellants) do not recover the land sued for; that defendants S. P. Childress and H. G. Wilson go hence without day and recover costs, and that the warrantors of defendants (naming them) go hence without day and recover their costs, etc.

The appeal bond is payable to Childress and Wilson only. The warrantors were parties defendant (Sayles' Rev. Stats., article 5252), were interested adversely to plaintiffs and have rights under the judgment that would be affected by the appeal. The bond should have been made payable to them also.

Instead of dismissing the appeal at this time, the case will be held on the docket for the time allowed for filing a motion for rehearing, during which time appellants may present to the clerk of this court a new bond payable to the proper parties, together with a motion to be allowed to file the new bond and for its approval by this court, and

for the service of the motion on the warrantors and giving their places of residence and providing also for the expenses of such service. See Bank of Decatur v. Preston Nat'l Bank, 85 Texas, 562.

[A new bond having been filed, the court rendered the following opinion on the merits of the case.—Reporter.]

. The action was brought by appellants to try title to the Alexander Bond survey 803, in Medina County, of 320 acres, which was patented to A. Baldinger, assignee.

The answer, besides the plea of not guilty, consisted of a plea of the ten years statute of limitation generally as to the whole survey, and specially as to a part of it consisting of about 41 acres. The defendants cited their warrantors.

Plaintiffs pleaded in a supplemental petition, in substance, that the survey was the community property of Andrew Baldinger and his wife, Ann Baldinger, the father and mother of plaintiff Clara Appel; that Ann Baldinger died November 7, 1877, and by her will devised to her husband a life estate in her half of the community property, with remainder to her children. That said will also provided that the share the daughter, Clara Appel, would take under said will at the death of the father should be a life estate therein with remainder to the heirs of her body, to wit, the other plaintiffs herein. That on March 26, 1883, there was a partition in the Probate Court between the estate of Andrew Baldinger (who died in 1880) and the children of Ann Baldinger, by which the land in controversy was set aside to the heirs of Ann Baldinger. That in December, 1899, the heirs of Ann C. Baldinger partitioned her estate and the tract in controversy was set aside to Clara V. Appel and her eight children, plaintiffs herein. That Clara V. Appel was married to her present husband, John H. Appel, in 1875.

The cause was tried by the court with judgment for the defendants. As plaintiffs established title, the judgment must have been based upon limitations. The judge has filed no conclusions and we are compelled to adopt and take as true any theory or state of facts which finds support in the evidence favorable to the judgment. There is testimony which, if accepted as true, supports the judgment in favor of the plea as to all of the survey originally fenced in by Sam Hutchison in 1874 or 1875. The plea, with its reference to this part of the survey, we shall consider first.

It appears in the evidence that Hutchison owned an undivided half of about 2,000 acres on the east side of Seco Creek in the Pablo Mancha league, and had control of the other undivided half; and in 1874 or 1875 he built a fence enclosing with said 2,000 acres some surrounding lands, thereby enclosing all of the survey in controversy except about 41 acres at its northeast corner. This enclosure formed what was known as the Hutchison pasture. There is no proof in the record that Hutchison ever used the pasture, consequently up to the time he disposed of it to Kilgore in 1878 the statute was not shown to have run. Enclosure without use is not sufficient. Dunn v. Taylor, 102 Texas, 80.

In 1878 Hutchison sold to old man Kilgore his 1,000-acre interest

in the Mancha survey. And the evidence, without setting it forth, may be said to show that he sold to Kilgore his fences and interest in fences surrounding the enclosure and delivered him the pasture as it stood in 1878, and Kilgore gave it to his son, Yancey Kilgore, and his son-in-law, John Strait, about that time.

Yancey Kilgore testified at the trial to the following facts: As soon. as we bought we built the fence along the south line of the Mancha survey from the west bank of the Seco due east to the east end of the lower Bond survey and joined the wood fence, thus closing out Hutchison, and throwing or leaving all of the survey 803, except the northeast corner, in our pasture. As soon as this south fence was · built John Strait built a house on the inside of the pasture and lived there until he died, and his widow lived there until she died, and his children lived there until they married or sold. It appears that this house was not upon the tract in question, but upon the Mancha survey.

It appears also that Yancey Kilgore and John Strait had a division in 1884 in which the former got 500 acres, and for this the latter got the rest of the Yancey interest or claim in the balance of the pasture and the fences around it.

Kilgore further testified: "While John Strait and I were together we had absolute control of the pasture and the fences around it, and no one could go in or take out wood or put in stock without our permission. We had the same control of the Bond land as we had of our other lands. . . . Up to the time Strait and I divided we owned the land and fences jointly and held joint possession of the fences and the land. . . . During our possession of this land we grazed stock on it and my brother-in-law had a farm on the Mancha land. We used the pasture for grazing purposes." The division between them took place in 1884 according to the witness Rutledge, and in 1885 according to Yancey Kilgore.

The witness J. B. Strait, son of John Strait, testified that in 1889, in the fall or winter, a wire fence was built near the east boundary of survey 803 by his father and Mr. Newton (who adjoined on the east) near where the original wooden fence was, and this wire fence when finished took in all of survey, including the 41 acres in its northeast corner, which up to that time was outside of the pasture. The same witness, as to the use of the enclosure by his father (his knowledge dating from 1885), testified: "Our house was on the inside of this enclosure; we were using it for our home and pasture; farm and everything were inside this pasture; we used the Bond surveys for pasture only, as they were only grazing land and not fit for farming. . . . While my father lived there no one could put cattle in there and no one could haul wood off the land; no one ever went into that pasture and put cattle in there, or hauled off wood without my father's consent. While father lived there he had absolute control of the land and the fences around it. As far as I can remember no one ever put any cattle in the pasture or hauled any wood from the pasture since my father's death, and since my mother's death no one has put any cattle in the pasture or hauled any wood off without our consent." John Strait, the father, died in April, 1895.

We are of opinion that the above testimony touching the possession and use of the lands in said pasture was sufficient to authorize the trial judge in deciding that it met the requirements of the ten-year statute from and after the time Kilgore and Strait took control of it, which was in 1878. We are also of the opinion that the testimony of Newton relative to a conversation with John Strait in 1889, when he (Newton) and John Strait built the wire fence above referred to, which conversation was relied on as tending to show that John Strait was asserting no claim to the survey in question, was not conclusive. John Strait was dead; there was no one in position to contradict the witness; and the conversation, if it occurred, took place so long ago that the court, who saw and heard the witness testify and the terms of his testimony, was authorized to reject his testimony or attach no weight to it. Certainly we can not hold that, under the circumstances, the judge was obliged to accept it or give it weight.

We are also of opinion that the fact that, after the death of John Strait in 1895, his wife, as his administratrix, did not include this survey 803 in the inventory of his estate, and the fact that after the death of Mrs. Strait her administrator, J. B. Strait, did not place it upon his inventory, are not conclusive evidence that neither had been claiming it during their respective possessions. Such facts are circumstances and are entitled to just such weight as a jury, or the court sitting as a jury, may attach to them. (Waller v. Leonard, 89 Texas, 507.) A person may occupy land for the requisite time and under the conditions necessary to confer title on him by the statute, and yet he or his representatives may not be sufficiently aware that such title has actually accrued to dictate the propriety of placing it upon an inventory. Disabilities may have existed which would prevent such a title from arising even where the possession has been sufficient, and they generally are unknown and were probably unknown in this instance. The judge was not compelled to give said fact controlling effect, and we have no right to reverse his views in reference to such matters.

The following testimony is also relied on by appellant. Appellant states in the brief: "John Muennick testified that John B. Strait, administrator of estate of M. E. Strait, in 1904, told him he could not sell it. He told me that he had 1,000 acres and the other he had no papers to and could not sell it." That Henry Kueck testified: "I recall having a conversation with Jesse Strait in reference to buying some land known as the Bond surveys, and he said he could not sell it—that he could not give title to it." That Fritz Faseler testified: "As to whether or not I know where the Bond surveys are in the enclosure of Mr. Strait's, I will say I know that I know the land I bought from Mr. Grunewald. I had a conversation with Jesse Strait in regard to the land. He said that some on the east side was not for sale and said it was not his."

Jesse Strait testified: "I heard the statement of John Muennick, and as to whether or not the same is true I will say that I don't know whether or not the same is true; I will say that I don't know anything about it. If I ever did make any such statement I was out of my head. I never made any statement to Fritz Faseler about the land."

Upon this testimony of Strait, the right of the trial Judge to discard the testimony of Muennick and Faseler is unquestionable. It appears that the Baldingers began assessing the land in 1893 and continued to do so until 1902. The testimony given by Henry Kueck had reference to 1901. It was admissible for the court to regard the declaration which Kueck testified to as having reference to Strait's inability to give a clear title. At all events, all this testimony was entitled to be weighed as circumstances in their bearing on the past acts of Kilgore and the Straits in reference to the land, and it was, under the circumstances, the peculiar province of the trial judge to give them such weight and effect as he considered them entitled to.

It was shown that Ann Baldinger died in November, 1877, which was before the possession of Kilgore and Strait began. By her will she devised her half of the community property as indicated in the first part of this opinion. Upon this disposition is based the contention that by reason of the then existing coverture of Clara Appel and the existence of the remainder interests created by the will in favor of herself and children, the statute could not operate against them.

Andrew Baldinger died June 6, 1880, but, by reason of what is said in the following paragraphs, it is not necessary to notice the effect of the statute upon his half of the land further than to state that if limitation began to run in 1878, it clearly would have run against his community interest in the land and continued so to run.

The will directed that her husband should have the use of and the rents, income and revenues of all her property during his natural life, and while he lived he was to have absolute and entire control and management of the property without interruption, opposition, or interference on the part of her heirs or executors, specially providing that the executors should have nothing to do with her estate until the death of her husband.

The third and fourth clauses of the will direct as follows: After the death of her husband, the share of each daughter who shall be then living (they all appear to have been living when the father died) "shall not absolutely vest in any such daughter, but her share shall be retained by my executors and trustees for the time being and put at interest or upon rent, and only the income and rent thereof paid to my said daughters, or either of them, during their natural lives. And after their decease, or the decease of either, the whole share or portion of such deceased daughter to be equally distributed among her lawful heirs (children) according to the laws of this State when all such heirs (children) of such deceased daughter shall have attained their majority. No division or distribution of such heirs' (children's) portion to be made until the youngest child attains his majority as aforesaid. But their respective portions to be kept, retained, managed and controlled by my executors herein, and the rent, revenues and income thereof to be appropriated, devoted and applied so far as requisite to the schooling, education, support and maintenance of such heir or heirs during their minority, and any child attaining his or her majority before the youngest child shall receive all the revenues and income of his or her share or portion. That is to say, the daughters are only to have a life interest in their respective shares or portions. The share

of each daughter during her life to be retained as aforesaid by the executors or trustees herein appointed. . . . My executors shall retain the entire property of the share of each of my daughters whether it be real or personal estate during the life of such daughter and pay over the use, rent and income thereof quarterly, or oftener, as may be convenient to them, into the hands of my daughters, or either of them upon their or her sole receipt therefor. That is to say, each one receiving the rent, interest, income and revenues received and derived from her share or portion.

"No share herein devised to my sons shall be paid or delivered until the party so entitled attains twenty-one years of age; provided, however, that no share or portion shall be set apart and allotted to any such heirs when property is depreciated, nor at a time when property to make such division would have to be sold at a sacrifice or below its fair market value. And before any share or portion is so allotted and set apart to any such heir, being twenty-one years of age, the executors herein named shall have, first, four months' notice in writing that such heir desires his portion or share of the estate, and my executors shall then have twelve months from the expiration of such notice within which to give and allot to such heir his said share or portion. My said executors shall have full power and authority to grant, bargain, sell, alien and convey any of my estate and property and make any deed or conveyance or other writing that may be necessary to execute, fulfill and carry out this provision which applies only to my sons and their heirs."

The fifth clause of the will appoints two of her sons "my executors and trustees of this my last will and testament." The executors duly qualified.

We think the opinion in the case of Dulin v. Moore, 96 Texas, 135, requires the will to be construed as vesting the title to the property in her executors and trustees. It declares that the share of the daughters shall not vest in them, but the same shall be "retained" and "kept" by her executors and trustees. It provides for a distribution of the property in time, presumably by the executors or trustees. It contains a power to sell and convey in connection with the devise to the sons. As to the sons it is unmistakably clear that the testatrix directed the executors or trustees to retain their shares also. They were given power to control and manage the property with full discretion, and they are denominated "trustees." This being the appropriate construction, their relation to the property was such that the statute of limitations would operate against the title to the property in their hands against the devisees. Wiess v. Goodhue, 98 Texas, 274; Belt v. Cetti, 100 Texas, 97.

We conclude that when Kilgore and Strait took possession of the pasture in 1878, the conditions created by the death of Mrs. Baldinger and her will presented no obstacle to the operation of the statute; that the evidence was such as to warrant finding that the possession of Kilgore and Strait, and subsequently of the Straits, was sufficient, and continued for a sufficient length of time to vest in him title by the ten years statute to all of the Bond survey which was contained in the original enclosure,

As to the 41 acres, or about that quantity of land, at the northeast corner of the survey which was not fenced into the enclosure until the winter of 1888: At that time it is not claimed that any condition of affairs existed which would prevent the operation of the statute, except the conditions created by the said will which we have determined were no obstacle. John Strait, after he enclosed the 41 acres, lived until 1894 or 1895, and the same use he made of it continued by his heirs, and we conclude further that under the evidence the court was warranted in finding that he and his heirs had such possession and use thereof as was sufficient and continued for a sufficient time to mature a title thereto by force of said statute. Judgment affirmed.

*Affirmed.*