PECK v. POWELL et al.  (No. 2223.) *

(Court of Civil Appeals of Texas. Amarillo. Jan. 2, 1924.  Rehearing Denied Jan. 30, 1924.  Second Motion for Rehearing Denied Feb. 27, 1924.  All Opinions Refiled as of Date March 5, 1924.  Third Motion for Rehearing Denied March 19, 1924.)

**1. Action ⬛59—On consolidation of actions, parties should replead.**

When one or more cases are consolidated, the proper practice is to require the parties to replead.

**2. Mines and minerals ⬛97—Parties to purchase of oil lands held partners.**

Where defendant advanced money to M. for the purchase of oil lands, under an agreement to divide the profits, they were partners in the transaction.

**3. Partnership ⬛15—May be formed to buy or sell single tract of land.**

A partnership may be formed to buy or sell a single tract of land.

**4. Partnership ⬛259—Continuance of partnership presumed till dissolution proved.**

Continuance of a partnership once formed is presumed until its dissolution is proved.

**5. Partnership ⬛74—Partner advancing money for firm business, is firm's creditor.**

When one partner advances money for the firm business, he is, in the absence of a special agreement, a creditor of the firm.

**6. Partnership ⬛108—Ordinarily one partner cannot sue another without accounting and dissolution.**

Ordinarily one partner cannot, without an accounting and dissolution, sue another partner in relation to matters connected with and growing out of the partnership business.

**7. Mines and minerals ⬛99(2)—Facts held to show relation of debtor and creditor as between partners as respects money intrusted by one to the other for purchase of oil land.**

Where partner in proposed purchase of oil lands used money intrusted to him for the purchase of the land by the other partner for his own personal benefit, in violation of the partnership agreement held, that as damages for the wrongful conversion belonged exclusively to the other partner, and could be assessed without accounting, the relation of debtor and creditor existed.

**8. Payment ⬛38(1)—Generally debtor may direct application.**

Generally a debtor when making payment may direct that it be applied to a particular debt.

**9. Payment ⬛47(1)—Third persons cannot control application.**

Third persons cannot control application of payment by either debtor or creditor, and neither need apply payment in such manner as to benefit third persons.

**10. Payment ⬛47(1)—Promise to apply payment in particular way subject to debtor's right to direct application.**

Plaintiff's promise to apply money he expected to receive from defendant's debtor on defendant's note, held subject to legal right of the debtor to apply the payment otherwise at his option.

**11. Assignments ⬛52—Liens ⬛7—Agreement held not to create equitable assignment or equitable lien on any fund.**

Where partner used funds for his advantage, and when called to account for such misapplication stated he was going to raise the money, and it was understood in the conversation that it would be paid to the other partner's creditor to be applied on certain notes, held, that there was no equitable assignment or creation of an equitable lien, since no fund was in existence.

On Second Motion for Rehearing.

**12. Statutes ⬛243—Relating to right of appeal liberally construed.**

Statutes relating to the right of appeal must be liberally construed in favor of appellant.

**13. Appeal and error ⬛391(5)—Tender of new bond, when sufficiency of original one attacked, timely, though after second motion for rehearing presented.**

Where, in consolidated actions there was practically but one issue, and the rights of the parties so interwoven that determination of one fixed the rights of the others, the failure of appellant to make one appellee an obligee in his supersedeas bond did not defeat jurisdiction, and a tender of a new bond, under Vernon's Sayles' Ann. Civ. St. 1914, arts. 1609, 2104, when the sufficiency of the original one was first attacked, was in time, even though it was made after second motion for rehearing was presented.

Appeal from District Court, Wilbarger County; J. V. Leak, Judge.

Separate actions by O. B. Morris and another against W. O. Powell, by J. B. Morris against A. P. Peck, and by W. O. Powell against A. P. Peck.  Actions consolidated. From the judgment rendered, A. P. Peck appeals.  Reversed and rendered.

O. T. Warlick, of Vernon, and Pearson & Monning of Amarillo, for appellant.

Berry, Stokes & Killough, of Vernon, for appellees.

HALL, C. J.  [1] At the February, 1923, term of the district court of Wilbarger county, there were three cases pending upon the docket of said court, to wit, No. 2918, J. B. Morris, and A. P. Peck v. W. O. Powell; No. 2944, J. B. Morris v. A. P. Peck; No. 2945, W. O. Powell v. A. P. Peck.  These cases arose from the same transaction.  At the February, 1923, term the court ordered that said cases be consolidated.  When one or more cases are consolidated the proper prac-

---

⬛For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error in appeal of Morris granted April 16, 1924.

tice is for the court to require the parties to replead. Ralston v. Aultman, Miller & Co. (Tex. Civ. App.) 26 S. W. 746; Wright v. Chandler (Tex. Civ. App.) 173 S. W. 1173; Avery v. Popper (Tex. Civ. App.) 45 S. W. 951. This has not been done in the instant case, and the result is that the record contains 11 different pleadings, as they were originally filed in the three separate cases. We find it a difficult and tedious matter to state the issues from these numerous pleadings, but will endeavor to do so.

In cause No. 2918, styled J. B. Morris and A. P. Peck v. W. O. Powell, Peck, as one of the transferees of a note for $30,000, which had been made payable to Clois L. Green by W. O. Powell, sued Powell, alleging that Green owned an interest in the said note to the extent of $19,000; that Peck and Morris each owned $5,500 interests; that about November 19, 1920, Green accepted Powell's note for $19,000 in full of his interest in the $30,000 note sued upon, which said sum should be credited thereon; that about January 10, 1921, Morris accepted the defendant Powell's note for the sum of $5,500 in full of his interest in the note sued upon, which sum should be credited thereon, and that plaintiff Peck is the owner and holder of the balance of said original $30,000 note, amounting to $5,500, with interest from the date thereof, the 27th day of April, 1920. At the September term, 1921, Powell answered with general demurrer, several special exceptions, general denial, and specially alleged that the said $30,000 note was given in part payment for an oil lease, bought from Green on acreage near the Burk-Cameron oil well, in Wichita county; that said acreage was owned by Clois L. Green, R. M. Waggoner, J. B. Morris, E. H. Pigg, and A. P. Peck, and possible others, but that the acreage was held in the name of Green, and he was authorized to handle the same as if he owned it; that while the note was made payable to him it was owned by all the parties interested in said acreage ratably; that Green made various sales from said acreage until some time in October, 1920, at which time Morris and Peck called upon him for their part of what had been collected from sales, and that Green delivered to them said $30,000 note, which he had been unable to collect, with the understanding that Morris and Peck should collect it and apply the proceeds according to the interests of the several parties entitled thereto; that Morris and Peck at once filed suit, and attached valuable property belonging to the defendant Powell, and afterwards, about the 15th day of November, 1920, this defendant went with Morris and Peck to see Green at Wichita Falls, and it was there agreed that the said $30,000 note should be canceled; that Powell would execute to Peck a new note for his interest in said $30,000 note; and that he would execute to Morris, Green, Waggoner,

and Pigg each a note for their respective interests, which was done; that the note executed and delivered to Peck was in the sum of $5,776.89; that the other notes were executed to the respective parties for the several amounts due them, and were accepted with the understanding that they should supersede and take place of the $30,000 note, which was thereby canceled, and became of no force and effect; that it was further agreed that this suit (2918) should be dismissed.

It is further alleged that afterwards, about the 27th of November, 1920, this defendant Powell made a definite contract with Morris, Peck, and one C. M. Murray; the said Murray owing this defendant the sum of $7,000, whereby it was agreed that the amount so raised by Murray should be paid to Peck, who should apply one-half thereof as a credit on his said new note, and the other half to be paid to Morris and credited on the note of this defendant to Morris. It was further agreed that the attachment liens should be released, by reason of which things the $30,000 note sued upon has been settled and discharged; that defendant and Morris thought this suit had been dismissed until in January, 1921; that when they learned Peck had not dismissed it they called his attention to the fact, and he informed them both that he would not dismiss it, but intended to prosecute the same to final judgment. By reason of such refusal the defendant has been required to employ attorneys to make his defense; that because of the willful and malicious refusal of Peck to dismiss said suit he has incurred costs and expenses and loss of time, to his damage in the sum of $500; that by reason of the attachment defendant has incurred loss in the management of his business and injury to his credit and loss of time, to his damage in the sum of $5,000.

In reply to this pleading, Peck, by supplemental petition, specially alleges that on or about the 15th day of November, 1920, he went with Morris, defendant Powell, and E. H. Pigg to see Green and other parties owning an interest in the $30,000 note; that Green drew up new notes, representing the respective interests of the several parties in the note sued upon, which were executed by defendant Powell; but that Morris and plaintiff Peck refused to accept the notes tendered them, for the reason that said notes were unsecured. Powell insisted, however, that plaintiff and Morris retain the notes which he had delivered to them until he could furnish security which would satisfy them. He denied that any contract was entered into with Murray, whereby one-half of the $7,000, which he owed Powell, and which was paid to plaintiff, should be credited upon Morris' note; that on November 27, 1920, Murray owed plaintiff the sum of $7,000, for

an undivided interest in plaintiff's undivided $50,000 interest in certain oil and gas leases 'around the Burk-Cameron well, which had been purchased in the name of Green, and were owned by various parties in the aggregate sum of $271,000. Plaintiff says that he agreed with defendant Powell that he would apply any payments which Murray might make on Powell's obligation to him, and that Murray has never at any time made any payments for the benefit of Powell, and plaintiff is informed and believes that Murray is not indebted to Powell in any sum; that on or about the 7th day of December 1920, Murray paid plaintiff $5,500 in cash, and at the time of its payment directed that said sum be applied toward paying for Murray's interest in the above-mentioned acreage, and that at said time Murray executed to plaintiff his note for $1,500 for the balance of his $7,000 interest purchased from plaintiff. He further specially denies that he ever agreed to dismiss this suit; that the defendant thereafter promised plaintiff that defendant's brother would become his surety to plaintiff, and also promised to obtain money by executing a deed of trust upon certain property owned by defendant in Memphis, Tex., but failed in both instances to provide such security; that said representations were made for the purpose of having this suit dismissed, and for the purpose of obtaining a release of the attachment lien upon said Memphis property. Plaintiff pleaded in the alternative that, in the event the court should hold that he was not entitled to recover his interest in the $30,000 note sued upon, then that he have judgment for the sum of $5,776.89, with interest and attorneys' fees, as represented by the original note. By supplemental answer defendant Powell alleged that the money raised by Murray and by him paid to Peck was to be applied, one-half upon the new note executed by Powell to Peck, and the other half upon the note for the same amount, executed by him to Morris, in accordance with the agreement and understanding between all the parties, and that the failure of said Peck to so apply said money was the conversion of same to his own use and benefit.

In cause No. 2944, styled J. B. Morris v. A. P. Peck, Morris, as plaintiff, sets out the fact that in the early part of April, 1920, he, with Green, Waggoner, and Pigg, bought a large amount of acreage in Wichita county, in the name of Green, for which they paid the sum of $272,000, and in which plaintiff and defendant each acquired an undivided 25/136 interest; that thereafter Green, acting for himself and his joint owners, assigned 'a lease upon 20 acres thereof to W. O. Powell for $60,000, $30,000 of which was paid in cash, and the remainder by a note for $30,000, which was the joint property of all the owners in the original lease. That in April, 1920, C. M. Murray approached Powell, and agreed with Powell that, if he would furnish the money, he, Murray, would acquire some of the acreage, and from the profit to be derived therefrom would repay the money so furnished, and divide the profits equally between the two; that Powell furnished Murray $7,000 in cash for the purpose of purchasing an interest in said oil lease, but which money Murray used to pay his individual debts, and for other purposes, fraudulently misapplying the same; that thereafter, in October, 1920, plaintiff and defendant called upon Green for their part of the proceeds derived from sales of leases, and that Green assigned to them said note for $30,000, executed by Powell, which he had been unable to collect; that he and Peck sued on said note, and caused attachments to be issued and levied upon valuable property belonging to Powell; that thereafter, on the 15th day of November, it was agreed between plaintiff, defendant, Waggoner, Green, and Pigg, on the one hand, and Powell on the other, that, in lieu of said $30,000 note, Powell should execute, and he did execute, to plaintiff, defendant, and each of the others, his several notes for their respective interests in said $30,000 note, which said new notes were accepted by each of the parties; that when suit No. 2918 was filed in the district court of Wilbarger county by plaintiff and defendant against Powell, and said attachment was levied, he, Powell, made an effort to settle the same and get the attachment released; that in the meantime Powell found that Murray had fraudulently misappropriated the $7,000 which he had furnished, as above alleged; he demanded of Murray the repayment of said sum, which Murray stated he could obtain from friends and relatives; that about November 27, 1920, plaintiff, Morris, Powell, and Murray agreed and contracted amongst themselves that when said Murray obtained said sum of $7,000 that he should pay the same to Peck, who would apply one-half thereof on his individual note and debt against Powell, and would pay the other half to Morris, to be applied upon Powell's note to the latter, and that he would release the attachment lien which had been fixed upon Powell's property, and would dismiss said cause No. 2918; that soon thereafter Murray paid the $7,000 to Peck, and that Peck has refused to pay any part thereof to plaintiff Morris, to his damage in the sum of $5,000.

By second amended original answer, defendant Peck in cause No. 2944 replied to Morris's original petition, alleging in substance that he owned $50,000 undivided interest in the acreage in the vicinity of the Burk-Cameron well; that he sold a certain per cent. of his said interest to various parties, including C. M. Murray, who agreed to

pay him $7,000, for the part conveyed to him. The pleading further sets out in detail, which we deem immaterial here, various transactions with other purchasers, not heretofore mentioned, of his interest, and alleges that the $7,000 paid him by Murray was in settlement of the interest so conveyed to Murray, and was not paid to be credited on the $30,000 note executed by Powell. He further alleges that about the 10th of November, 1920, he was informed by Powell that he had purchased for $7,000 Murray's interest in the Burk-Cameron acreage, and that he had demanded that Murray return to him the $7,000 so paid, whereupon he, defendant, demanded of Murray the payment of $7,000, which Murray had agreed to pay him for said acreage. That defendant is informed and believes that Powell, in demanding the return to him of the $7,000, which he had loaned Murray, threatened Murray's life, and further threatened to subject him to criminal prosecution, and by means of duress obtained an agreement from Murray to return said $7,000; that the said Murray never delivered to defendant any sum of money for W. O. Powell; and that the only money, notes, securities, or other things of value which Murray ever delivered to defendant were so delivered for the sole and only purpose of paying the amount which Murray owed defendant for an interest in said Burk-Cameron acreage; and that, when said money was so paid by Murray, it was with the express direction from him that the same be applied by defendant to the amount which Murray owed him for said acreage; that about the 12th day of December, 1920, Powell approached defendant, and said that he had decided that Murray should go ahead and pay defendant $7,000 which Murray owed for the Burk-Cameron acreage, and that he, Powell, would make no further demands on Murray for the return of the $7,000 which Powell had furnished him, but could accept the interest in the acreage owned by Murray, and which he, the said Powell, bought from Murray. By supplemental petition Morris alleges briefly the facts set out in his original petition in denial of the facts alleged by Peck in his amended answer. By first supplemental answer Peck again briefly alleges the main facts set up in his amended answer.

Cause No. 2945, entitled W. O. Powell v. A. P. Peck, was filed to the said February term. In his original petition Powell sets out at great length the original acquisition of the Burk-Cameron acreage by numerous parties, the acquisition by Morris and Peck each of about 25/136 thereof, the handling and sale of portions thereof by Green, the sale to Powell of 20 acres for $60,000, and the execution of the $30,000 note sued on in cause No. 2918. He further sets up the fact that he loaned Murray $7,000 with which to acquire an interest in said acreage; that Murray did not use the money for said purpose, but fraudulently misappropriated it, using it to pay his personal debts, and for his own private benefit. The facts with reference to the execution to each of the parties interested in the $30,000 note, separate notes for their respective interest are set out, also the institution of suit No. 2918, the payment by Murray to Peck of $7,000, the promise of Peck to deliver one-half of said sum to Morris, and the further agreement on the part of Peck to dismiss said suit No. 2918, and release the attachment liens which had been fixed upon plaintiff's property. The prayer is for $5,500, which defendant Peck has received from Murray, with interest thereon, or, in the alternative, that he be required to credit said note with half of the amount so received, and that he be further ordered to deliver the other half of said sum to Morris, to be credited on the note executed by plaintiff to Morris. Peck's answer in this case is a detailed statement of the various transactions, agreements, and acts which we find in the pleadings filed by him in the other two suits. Powell replied by first supplemental petition, which is a brief statement of the facts in the first original petition, denying the facts set up in Peck's pleading.

[2] The first contention to be considered is that the fourth finding of fact is unsupported by the evidence. The essence of the contention is that Murray and Powell were partners in virtue of the agreement between them at the time Powell let Murray have the $7,000, and, since they were partners in the venture, the relation of debtor and creditor did not exist between them. Powell testified that Murray came to him and said:

"'Burk-Cameron has got a well, and the boys are buying a lot of acreage, and I think I can get some of that acreage if I can get the money,' and I said, 'All right, Murray, how much do you think you can get?' And he said, 'I don't know, but if you will furnish the money I will see how much I can get.' I said, 'All right, do you think you can get as much as $5,000 worth?' And he said, 'I believe I can,' and I said, 'All right, if you can get that much, I will put up the money, and as soon as the stuff is sold off enough for me to get my money back I will get my money back, and after that we will divide the profits from there out.' And he said, 'All right,' and I went to the hotel and wrote him a check for $5,000."

Powell further testifies that Murray left, and in a day or two returned and said:

"'I bought $5,000, and I can get $2,000 more,' and offered to let me have the additional $2,000 on my own account, but I told him that we would handle that just like the other; I told him that after I got my money back we would split the profits. I gave him a check for $2,000, and when he came back I said, 'All right, Murray, did you get it?' And he

said, 'Yes.' I said, 'Did you get an assignment or document showing you had that interest?' He said, 'Yes.' "·

The substance of Murray's testimony upon this point is that he told Powell he would put up his information on the well against Powell's money, and that they were to own the lease and divide the profits on a fifty-fifty proposition. Aside from Murray's evidence, Powell's statement of the transaction is sufficient to show that Murray and Powell were partners in the acreage to be obtained from Peck. Kelley & Co. v. Mastérson, 100 Tex. 38, 93 S. W. 427; Cothran v. Marmaduke, 60 Tex. 370, Avery v. Llano Cotton Seed Oil Co. (Tex. Civ. App.) 196 S. W. 351. As said by Justice Phillips, in Freeman v. Huttig S. & D. Co., 105 Tex. 560, 153 S. W. 122, Ann. Cas. 1916E, 446:

"It is immaterial that the business yielded no profits, and that in consequence Freeman shared in none. There existed by his tacit agreement a community of interests, the common enterprise, its operation for the joint account, and a right in the owner of each interest to share as a principal in its profits as such, which under the established rule in this state is a recognized test of the relation."

[3-6] It is true that a partnership may be formed for the purpose of buying and selling a single tract of land (Rush v. Bank [Tex. Civ. App.] 160 S. W. 319); that the continuance of a partnership once formed is presumed until its dissolution is proven (Devine v. Martin, 15 Tex. 25); that when one partner advances money for the firm business he is, in the absence of a special agreement, a creditor of the firm (30 Cyc. 441), and·it is also true that ordinarily one partner cannot without an accounting and dissolution sue another partner in relation to matters connected with or growing out of the partnership business (Lockhart v. Lytle, 47 Tex. 452; Merriwether v. Hardeman, 51 Tex. 436; O'Neill v. Brown, 61 Tex. 34). But there are exceptions to the last-named rule which we think apply to this case.

"It is often stated as the rule that partners can sue each other at law on claims connected with the partnership relation but which do not require an accounting." 2 Rowley's Modern Law of Partnership, § 745.

"In a Massachusetts case [Ryder v. Wilcox, 103 Mass. 24] the court quotes Mr. Lindley: 'It is said that an action at law for damages for the breach of an express agreement entered into by one partner in favor of another will only lie where the action can be properly tried without going into the partnership accounts, and the damages sought will belong exclusively to the plaintiff, and where the plaintiff will not be liable in any contingency affecting the future joint business to contribute to his own payment.' The court said: 'But without stopping to inquire whether this action can be maintained without violating these rules it is sufficient to say that whatever the nature of the agreement it must be one in which the defendant binds himself personally to the plaintiff.' Judge Story has stated as an exception to the general rule: 'Whenever there is an express stipulation in the partnership articles which is violated by any partner an action at law, either assumpsit or covenant, as the case may require, will ordinarily lie to recover damages for the breach thereof.' The same rule holds as to any express individual contract between partners. It has been said, however, that a 'consideration of the statement and of the authorities cited to sustain it will show that the cases falling within this exception are of three classes: (1) Those in which the partnership is inchoate, and has never been launched; (2) those in which the partnership is at an end; and (3) those in which the stipulation which is violated and for the breach of which the action is brought is one between the partners individually and the damages from which belong exclusively to the other partner, and can be assessed without an accounting.' " Id., § 746.

"As to agreements entered into by parties before the partnership relation was formed, the ordinary rules that one partner cannot sue another at law do not apply." Id. § 747.

"Where the association as partners is for a single transaction, one partner, at its close, may maintain an action at law against the other for his share of the profits, and a formal accounting is unnecessary. Such a relationship is not exactly similar to other forms of partnership, it being a joint adventure rather. Id. § 748.

"In case of fraud by one partner in the partnership matters can another maintain an action at law against him therefor? The question is decided very generally in the affirmative by our courts. * * * 'Among the exceptions to the general rule is the right of one partner to maintain an action against another for the destruction of the joint property or its wrongful conversion.' * * * Neil, J., of Tennessee, in a very scholarly opinion, shows a very deep insight into the question, but said he, Is a partner responsible for a fraudulent conversion of 'stocks belonging to the firm within this rule? We see no reason why he should not be. If his wrongful act amounts to a fraudulent conversion within the technical meaning of that term, the effect upon those injured by his act is the same as if he were not a partner, and the legal quality of the act is the same, inasmuch as to hold the act complained of a fraudulent conversion necessarily is tantamount to saying that his relation of partner did not, under the circumstances, justify his act. But under what circumstances is a partner liable for a conversion; that is to say, fraudulent conversion? It is not, as I understand it, said the Master of the Rolls, in Ex parte Harris, necessary for the joint estate to prove more than in the words of Lord Eldon that the overdrawing 'was made for private purposes against the prohibition, either express or, implied, in ·the partnership agreement without the knowledge, consent, privity, or subsequent approbation of the other partners. That is all that is necessary to be proved. But, if that be shown, it is prima facie a fraudulent appropriation within the rule.' In the same case the court quotes from

and approves Mr. Parsons' statement as follows: "The fraud may be constructive only, and any act would be so which violated the articles of agreement of the partners, or abstracted or appropriated property or funds by the act of one partner only without the authority, consent, or knowledge of the other.' It may safely be stated that the principles laid down in the above cases and texts are very general, if not practically universal, both in the courts of England and the United States, and further that the rule is of ancient origin." Id. § 756.

[7] We think the instant case comes within the rules above stated. Murray did not purchase the acreage with the money given him, but used it for his own personal benefit. No business was ever transacted by or for the partnership, and there is clearly no necessity for an accounting. Under the express terms of the agreement it became the duty of Murray to purchase acreage with the $7,000 given him by Powell. His failure to do so is a gross violation of the partnership agreement. Moreover if the partnership was ever really launched it was ended when Murray squandered the capital intrusted to him for investment. The damages arising from his wrongful conversion of the partnership funds belonged exclusively to Powell, and can be assessed without an accounting. The act of Murray in converting the partnership funds amounts to fraud, and, having appropriated to his own use and benefit money intrusted to him for partnership purposes, without the knowledge or consent of Powell, we think it is clear that the relation of debtor and creditor existed, and that the finding of the jury is correct both in fact and in law. George on Partnership, p. 307; Gilmore on Partnership, p. 470; 2 Bates on Partnership, §§ 867, 871, 897.

[8, 9] The next contention made by appellant Peck is that, when Murray paid Peck the $7,000, and directed that it be applied to the payment of Murray's indebtedness to Peck for the interest he had purchased in the Burk-Cameron acreage, Peck was bound to apply such payment in accordance with Murray's directions. This is the general rule. Citizens' Lumber Co. v. Marr (Tex. Civ. App.) 153 S. W. 660; Kempner v. Patrick, 43 Tex. Civ. App. 216, 95 S. W. 51; Watson v. Dodson (Tex. Civ. App.) 143 S. W. 329; Crawford v. Pancoast (Tex. Civ. App.) 62 S. W. 559. The rule is further stated that third persons cannot control the application of a payment by either the debtor or the creditor, and that neither the debtor nor the creditor need apply the payment in such manner as to benefit any third persons. 21 R. C. L. p. 107, § 115; Consolidated Naval Stores v. Wilson, 82 Fla. 396, 90 South. 461, 21 A. L. R. 681; Wyandotte Coal & Lime Co. v. Wyandotte Paving & Construction Co., 97 Kan. 203, 154 Pac. 1012, Ann. Cas. 1917C, 580.

[10] There was no consideration moving to Peck for his promise to apply the money which they expected to receive from Murray, one half to Powell's note to Morris, and the other half to Powell's note to Peck. Such promise was gratuitous, and subject to the legal right of Murray to apply the payment otherwise at his option. At the time of the agreement the parties are presumed to have known that Murray had the primary right to make his own application of the money which he expected to obtain to the payment of any of his debts. True, he had accepted Powell's $7,000, and wrongfully converted it to his own personal use in violation of the partnership agreement, which rendered him legally liable to Powell. 2 Rowley's Modern Law of Partnership, § 756; Hunt v. Reilly, 50 Tex. 99.

[11] But the right of Morris or Powell to recover against Peck in this action depends upon whether by the agreement there was an equitable assignment of or such an equitable lien created upon the money to be thereafter raised by Murray as would entitle them to enforce such right against the fund in Peck's hands. The statement of facts discloses that Murray was called into the presence of Morris, Powell, and Peck, and upbraided for misapplying the money which Powell had intrusted to him for partnership purposes. Murray said he was "going to get the money." It is apparent from the evidence that he had no money at that time, and from his testimony upon the trial it appears that he expected to obtain it from his "home and friends," though he did not tell the parties from whom nor when he expected to get it; no particular fund was mentioned. During that conversation it was understood that if Murray succeeded in raising the $7,000 he should deliver it to Peck, who would make the application, one half of it upon his note against Powell and pay the other half to Morris. This agreement falls far short of an equitable assignment of a fund, and cannot be construed to be the creation of an equitable lien upon any fund, because at that time no fund was in existence. As said by Boyce, Justice in Patterson v. Citizens' National Bank of Lubbock (Tex. Civ. App.) 236 S. W. 130:

"It seems to be the well-settled law that a mere promise to pay a debt out of a particular fund will not operate as an equitable assignment pro tanto of the fund. 'An agreement to pay out of a particular fund, however clear in its terms, is not an equitable assignment; a covenant in the most solemn form has no greater effect. The phraseology employed is not material, provided the intent to transfer is manifested. Such an intent and its execution are indispensable. The assignor must not retain any control over the fund—any authority to collect, or any power of revocation. If he does, it is fatal to the claim of the assignee. The transfer must be of such a character that the fund holder can safely pay, and is compellable to do so, though for-

bidden by the assignor.' Christmas v. Russell, 14 Wall. 82, 20 L. Ed. 764. The authorities are equally clear that such an agreement will not itself be sufficient to establish an equitable lien on the fund. There must be something further to evidence the intention of the parties to charge the fund itself with the payment of the debt."

"In order to work an equitable assignment there must be an absolute appropriation by the assignor of the debt or fund sought to be assigned to the use of the assignee. The intention of the assignor must be to transfer a present interest in the debt or fund or subject matter. If this is done, the transaction is an assignment; otherwise not." 5 C. J. p. 909, § 78.

"The assignor of a chose in action must part with the power of control over the thing assigned; If he retains control it is fatal to the claim of the assignee. A mere direction by a party to his agent to apply certain funds to the payment of a debt does not operate as an equitable assignment of such fund, because such direction, until acted upon, may be revoked. There must be some character of delivery, actual or symbolic, or some act to place the fund beyond the control of the assignor. The specific subject-matter must be set aside. A mere intention to do so is insufficient. To constitute an assignment good, even in equity, there must be an actual or constructive appropriation of the subject-matter—a perfected transaction between the parties, intended to vest in the assignee a present right, even where the circumstances do not admit of its immediate exercise." Id. p. 912, § 79; McKneely v. Armstrong (Tex. Civ. App.) 212 S. W. 175.

With reference to an equitable lien, it is said in 3 Pom. Eq. Jur. (4th Ed.) § 1235:

"In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it or by so describing it that it can be identified, and must indicate with sufficient clearness and intent that the property so described, or rendered capable of identification, is to be held given or transferred as security for the obligation." Boehl v. Wadguymar, 54 Tex. 589.

There was no fund in esse or potentially at the time of the agreement upon which a lien could attach, and from the conversation between the parties it is clear that there was no intention to create a lien, but the understanding was that, if Murray could get any money from any source, one-half of it should be applied to each note. An equitable lien does not arise from such an agreement. 1 Jones on Liens, § 32. Such an agreement must also plainly designate the property upon which the lien is asserted. (Id. § 33), and the property or fund must be capable of identification. (Id. § 34). Even a promise to pay out of a particular fund does not create the lien (Id. § 52), and the same author says (§ 48):

"A mere agreement, whether parol or in writing, to pay a debt out of a designated fund when received, does not give an equitable lien upon that fund, or operate as an equitable assignment of it. The agreement is personal merely. * * * A covenant by a debtor to pay certain debts out of a particular fund, when the same should be received, is merely a personal covenant."

It is further said (§ 54):

"The designation of the particular fund must be clear and definite to give effect to an order as an equitable assignment, in distinction from an order drawn against a general credit."

Our Supreme Court, in Richardson v. Washington, 88 Tex. 339, 31 S. W. 614, says:

"We do not wish to be understood as intimating that a court of equity may foreclose a lien upon property which it cannot clearly determine that the parties, at the date the contract intended, should become subject to such lien when acquired by the grantor, or when it came into existence. On the contrary, a court of equity will not make a contract or create a lien for the parties, and therefore will not foreclose a lien upon property not in esse or not owned by the grantor at the date of the contract, unless it is clear that at such date the parties thereto anticipated the acquisition by the grantor of the very property upon which the lien is sought to be fixed and foreclosed, and intended that it should be subject thereto."

In the case of McDavid et al. v. Phillips, 100 Tex. 73, 94 S. W. 1131, in which was involved the validity of a chattel mortgage upon cotton to be raised upon any land which the mortgagor should cultivate until the mortgagee was paid in full, the court said:

"That language neither discloses property in existence, which is a proper subject of contract, nor does it give any description by which the thing that was in contemplation of the contracting parties could be identified at that time. * * * The terms of this mortgage did not point out anything which the parties to it could at that time know to be the subject of that contract, nor was the crop which is sought to be subjected to the mortgage here the product of anything which was at the time of the making of the mortgage capable of being identified and in which the mortgagor had an interest. It would be difficult to frame an instrument with less certainty in its terms than that which is submitted for our consideration. The time of its existence is limited only by the life of the mortgagor, and its locality might be anywhere 'on the face of the earth.' If such a contract were sustained, it would authorize the incumbering of a man's ability to labor for his natural life."

At the time of the agreement nothing was said by any party concerning the source from which Murray hoped to obtain the funds. No time was fixed within which he should procure the $7,000, nor was it understood whether it would come from relatives or friends in Tennessee, or elsewhere. He did not claim at that time to be interested in any estate, and at most he only hoped to

be able to secure the money from either friends or relatives, or both. We deem it unnecessary to consider the remaining assignments.

For the reasons above stated the judgment is reversed, and it is here rendered, decreeing that the appellant, A. P. Peck, recover of W. O. Powell the full amount of his note in the principal sum of $5,776.89, with interest from date, and 10 per cent. attorneys' fees. It is further decreed that J. B. Morris take nothing as against A. P. Peck. It is further decreed that W. O. Powell take nothing as against A. P. Peck, and that the note of W. O. Powell for $30,000 be and the same is hereby canceled. It is further ordered that A. P. Peck pay all costs which have accrued in cause No. 2918 to the date when he filed his amended pleading, declaring upon his individual note against Powell. It is further ordered that J. B. Morris pay all costs which have accrued in the court below in cause No. 2944. It is further ordered that W. O. Powell pay all costs which have accrued in the lower court in cause No. 2945, and that A. P. Peck recover of Morris and Powell, jointly and severally, the costs of this appeal.

Reversed and rendered.

### On Motion for Rehearing.

If we admit that there was a sufficient consideration moving to and from each of the parties at the time Murray said he would raise $7,000 from some of his homefolks or friends, the agreement itself did not create a lien upon and was not tantamount to an assignment of the fund, because there was no fund; in fact, the $7,000 was never raised; Murray only succeeded in obtaining $5,500 of that amount. In the motion it is asserted that this money was paid over to Peck under the contract. This statement is at variance with the record. Peck and Murray both testified that the money was paid and received to satisfy Murray's individual indebtedness to Peck for acreage. Let it be admitted that there was a valid binding contract between all the parties to deal with some fund not then in existence; the fact that money was subsequently raised does not bring it within the terms of such a contract so as to constitute an assignment or create an equitable lien upon it. In addition to the authorities cited in the original opinion we desire to quote from and add the following: 1 Jones on Liens (2d Ed.) § 34, says:

"It is essential to an equitable lien that the property to be charged should be capable of identification so that the claimant of the lien may say with a reasonable degree of certainty what property it is that is subject to the lien."

"A mere agreement, whether by parol or in writing to pay a debt out of a designated fund when received, does not give an equitable lien upon that fund, or operate as an equitable assignment of it. The agreement is personal merely. There must be an order or something that places the creditor in the position to demand and receive the amount of the debt from the holder of the fund without action on the part of the debtor. * * * A covenant by a debtor to pay certain debts out of a particular fund, when the same should be received, is a personal covenant." Id. § 48.

"To constitute an equitable lien on a fund, there must be some distinct appropriation of the fund by the debtor, such as an assignment or order that the creditor should be paid out of it. * * * It is not enough that a debtor authorizes a third person to receive a fund and pay it over to the creditor." Id. § 50.

"The rule that an equitable assignment can be effected only by a surrender of control over the funds or property assigned is one that is strictly held to. A promise that certain goods shall be held in trust for the benefit of another, and that the proceeds shall be paid to him does not amount to an equitable assignment of the goods or a specific lien upon them, for in such case the owner retains control of the goods, and may appropriate them or the proceeds to the payment of other creditors, and the holder of such promise cannot follow the goods any more than he could follow their proceeds. He has no lien either upon the goods or their proceeeds. The owner has violated his promise, and for this he is personally responsible." Id. § 51.

In Colleps v. Smith Lumber Co. (Tex. Civ. App.) 185 S. W. 1043, it is said:

"To create an equitable assignment of the fund, there must be delivery, actual or symbolic, or some act to place the fund beyond the control of the assignor, and a mere promise or agreement to pay a debt out of such fund is not an equitable assignment."

In First National Bank v. Campbell (Tex. Civ. App.) 198 S. W. 197, the court said:

"If the contracts under which the $5,084 was earned by the irrigation company were not in existence at the time the agreement between appellant and the irrigation company was made, said earnings had no potential existence, and any attempt to assign or mortgage such earnings was void." 5 C. J. 871, § 41; Campbell v. Grant (Tex. Civ. App.) 82 S. W. 794.

See, also, Lockett v. Farmers' State Bank (Tex. Civ. App.) 205 S. W. 526; Provine v. First National Bank (Tex. Civ. App.) 180 S. W. 1107; Davis & Goggin v. State National Bank (Tex. Civ. App.) 156 S. W. 321; Patterson v. Citizens' National Bank (Tex. Civ. App.) 236 S. W. 130.

The motion is overruled.

### On Second Motion for Rehearing.

The appellee, Powell, now moves the court to set aside the judgment reversing and rendering the judgment of the trial court, in so far as his rights are concerned, because he insists that this court is without jurisdiction to reverse his judgment against Peck, for the reason that he was not made an obligee in Peck's supersedeas bond. This

matter is now called to the attention of this court for the first time. It appears that that part of the judgment wherein Morris recovers against Peck is alone mentioned in the supersedeas bond and that Morris is the sole obligee. It is possible that the irregularity first pointed out in the original opinion, viz. the action of the court in trying three cases without formally consolidating them, and requiring a repleader, is in a measure responsible for the appellant's defective supersedeas bond. All parties are equally responsible for that irregularity. The defective appeal bond gave this court jurisdiction of the case. Hugo v. Seffel, 92 Tex. 414, 49 S. W. 369.

The rule announced by this court in Shamburger v. Glenn (Tex. Civ. App.) 255 S. W. 815, to the effect that, where there are separate causes of action, the judgment upon each cause is a separate judgment, and that the failure of one party to appeal from that judgment against him renders that judgment final, does not apply here. In this case there is practically one issue upon which the rights of the parties turn. If the agreement between Morris, Powell, Peck, and Murray is not tantamount to an equitable assignment of a fund, or is not such an agreement as will create an equitable lien upon the money which Murray thereafter raised, then neither Morris nor Powell would be entitled to recover. Recognizing this fact, Morris and Powell have joined their forces in the fight. The same facts are pleaded, they are represented by the same counsel, and the right of both to recover must necessarily be sustained by the same evidence. Their cause of action is the same, and their rights are so interwoven and interdependent that the determination of one necessarily fixes the rights of the other. Such being the condition presented by the record, a reversal as to either Morris or Powell inevitably results in a reversal as to the other. In the early case of Burleson v. Henderson, 4 Tex. 60, the action was by Henderson against Burleson and two others upon a bond. Judgment was rendered against all three of the defendants. Burleson alone appealed. The case was reversed as to all parties, the court saying:

"It appears to be the more convenient rule, that where a judgment is entire, where the judgments are not distinct and independent, or where the parties have not distinct and independent interests, and where the judgment operates to the prejudice of all the defendants, a reversal as to one shall operate a reversal as to the whole."

In Hamilton v. Prescott, 73 Tex. 565, 11 S. W. 548, the court said:

"Where the rights of one party are dependent in any manner upon those of another, it will treat the judgment as an entirety, and, where a reversal is required as to one, it will reverse the judgment as a whole."

In Drake et al. v. Yawn et al., 248 S. W. 726, the court said:

"But if said defendants had not given such notice, and had in no manner attempted to appeal from said judgment, still the judgment against them could not be affirmed, for there was but one question, one issue, in litigation, and that was the validity of the so-called 'consolidated county line school district.'"

In Fidelity Oil Co. v. Swinney (Tex. Civ. App.) 254 S. W. 137, it appears that one of the appellees was not made an obligee in the appeal bond. The rights of this appellee to a foreclosure were dependent upon the rights awarded his coappellees. The court held that such a judgment was an entirety and the judgment was reversed as to all parties. This case seems to be directly in point with the instant case, but the same principal is announced in the following cases: A., T. & S. F. Ry. Co. v. Smith (Tex. Civ. App.) 190 S. W. 774; Bell Oil & Refining Co. v. Price (Tex. Civ. App.) 251 S. W. 559; Bradford v. Taylor, 64 Tex. 171; Ferguson v. Dickenson (Tex. Civ. App.) 138 S. W. 221; G., C. & S. F. Ry. Co. v. Johnson, 91 Tex. 569, 44 S. W. 1067; Long v. Garnett, 45 Tex. 400, and authorities therein cited.

Since this is not such a judgment as can be affirmed in part and reversed in part, we properly disposed of the appeal in so far as our former opinion reversed the judgment as to both appellees. Article 1609, Vernon's Sayles' Ann. Civ. St. governing procedure in the Courts of Civil Appeals, provides:

"When there is a defect of substance or form in any appeal or writ of error bond, on motion to dismiss the same for such defect, the court may allow the same to be amended by filing in the said Courts of Civil Appeals a new bond, on such terms as the court may prescribe."

Article 2104, Id., provides:

"When an appeal has been or shall be taken from the judgment of any of the courts of this state by filing a bond or entering into a recognizance within the time prescribed by law in such cases and it shall be determined by the court to which appeal is taken that such bond or recognizance is defective in form or substance such appellate court may allow the appellant to amend such bond or recognizance by filing a new bond on such terms as the court may prescribe."

These articles of the statutes are so plain that a discussion of them is unnecessary. They have been frequently held to authorize the filing of a new bond where the original was defective in failing to name an adverse party as obligee. Crawford v. Wellington Ry. Co. (Tex. Civ. App.) 174 S. W. 1004; First State Bank & Trust Co. v. O. D. Mann & Sons (Tex. Civ. App.) 209 S. W. 683; Ricker v. Collins, 81 Tex. 662, 17 S. W. 378; Appel v. Childress, 53 Tex. Civ. App. 607, 116 S. W. 129; Wandelohr v. Grayson County National Bank (Tex. Civ. App.) 90 S. W. 180.

[12] It is the general rule that statutes relating to the right of appeal must be liberally construed in favor of the appellant: Eppstein & Co. v. Holmes, 64 Tex. 560, 565; Shelton v. Wade, 4 Tex. 148, 51 Am. Dec. 722. And the rule has been applied specially to the above-quoted statutes. Lewellyn v. Ellis, 50 Tex. Civ. App. 453, 115 S. W. 84. It was held before these statutes were enacted that, even after an appeal had been dismissed because of a defective bond, the case would be reinstated upon the docket, and upon application of the plaintiff in error time would be granted him to file a new bond. Boggess v. Howard, 40 Tex. 153. The same procedure is permitted since the enactment of said statutes. Texas Mexican Railway v. Cahill (Tex. Civ. App.) 23 S. W. 45; Giddings v. Odom-Lucket Land & Livestock Co. (Tex. Civ. App.) 34 S. W. 383. Fisher, C. J., in the last-named case, said:

"The motion for rehearing filed in this cause calls our attention to the fact that the appeal bond executed by appellants was not made payable to all of the appellees and for this reason we are asked to set aside our former judgment and to dismiss this appeal. In reply to this the appellant tenders an appeal bond payable to all of the appellees. We make the following ruling upon the question: The judgment reversing and remanding the case is set aside and the appellants are allowed to file the bond tendered and it is so ordered to be filed and is approved as the appeal bond in the case; and it is further ordered that the judgment below, as to all parties, is reversed and remanded for the reasons stated in the opinion heretofore delivered, and that said opinion be filed as the opinion disposing of the case."

[13] The statutes themselves fix no limit as to the time within which amended bonds may be filed. When the defect is one that can be waived, the general appearance of the appellee in the appellate court, or his failure to call the defect to the attention of that court promptly, is held to be a waiver. First State Bank & Trust Co. v. O. D. Mann & Sons, supra; Drake v. Yawn, supra. Under all the circumstances disclosed by the record, even a fair construction of said statutes demands that appellant be permitted to file a new bond. Supersedeas bonds are required primarily for the benefit of the appellee. Powell has had his day in court. Although he was not required to appear here, he has appeared, both by brief and by counsel in oral argument; he has filed, jointly with Morris, one motion for rehearing, in which the contention now urged was not mentioned, and, even if it be conceded that these acts do not amount to a waiver of the defect, still appellee has assumed an inconsistent position, which courts do not favor. If the appellant tenders a new bond when the sufficiency of the original bond is first attacked, he is in time, even though it be after a second motion for rehearing is presented.

We therefore order that our former judgment, in so far as it is rendered for the appellant, Peck, be and the same is set aside, and he is given 20 days from this date in which to file a good and sufficient supersedeas bond, to be approved by the clerk of this court. If such bond is so filed and approved, the former opinions will be refiled as the opinion disposing of the appeal; otherwise, the judgment of the trial court will be reversed and remanded.

The motion is overruled.